## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ESTATE OF JAY ANDERSON, JR. by Special Administrator, Starkeisha DeLaRosa;
J.A. minor child, through her next friend Starkeisha DeLaRosa.

    Plaintiffs,

|  |  |
|---|---|
| v. | COMPLAINT |
|  | Civil Action No. |
|  | [Trial by Jury Demanded] |

JOSEPH ANTHONY MENSAH, Former Officer with the Wauwatosa Police Department in his
    individual and official capacity;
BARRY WEBER, Former Chief of Police with the Wauwatosa Police Department in his official
capacity;
CITY OF WAUWATOSA, a municipality,

    Defendants.

Plaintiffs, by their attorneys Kimberley Cy. Motley, of MOTLEY LEGAL SERVICES and

E. Milo Schwab of Ascend Counsel, LLC respectfully allege for their Complaint and Jury Demand

as follows:

## I. INTRODUCTION

1. This was an execution.

2. It was deliberate.

3. There was no other possible result from Joseph Mensah's actions than the death of Jay
   Anderson, Jr.

4. On June 23, 2016 at approximately 3:07 a.m. Joseph Mensah woke up Jay Anderson, Jr.
   and killed him.

5. Joseph Mensah intended to kill Jay Anderson, Jr.

1

6. It was not Defendant Joseph Mensah's first killing and unfortunately, it would not be his last.

7. This case is the story of how failures in policing, failures of leadership, and a city steeped in racial discrimination created the conditions which would lead one police officer to intentionally kill J.A's Father, Jay Anderson, Jr.

## II. JURISDICTION AND VENUE

8. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and the laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiffs' claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

9. Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(b). All events alleged herein occurred within Milwaukee County.

## III. PARTIES

10. At all times relevant to the subject matter of this Complaint, the decedent Jay Anderson Jr. ("Anderson") was a citizen of the United States of America and a resident of and domiciled in the State of Wisconsin. Jay Anderson Jr.'s fiancé and mother to his daughter J.A., Starkeisha Delarosa, is the representative of the Estate of Jay Anderson Jr.

11. Plaintiff J.A. is the minor child of Jay Anderson Jr. At all times relevant to the subject matter of this Complaint, the decedent J. A. was a citizen of the United States of America and a resident of and domiciled in the State of Wisconsin. J.A. is represented through her next friend, her mother Starkeisha Delarosa.

12. Defendant City of Wauwatosa, Wisconsin ("Wauwatosa"), is a municipality organized under the laws of the state of Wisconsin, and is a "person" subject to suit under 42 U.S.C. § 1983. The Wauwatosa Police Department ("WPD") is a law enforcement agency that is part of the City of Wauwatosa.

13. At all times relevant to the subject matter of this Complaint, Defendant City of Wauwatosa was responsible for the oversight, supervision, discipline, and training of WPD personnel.

14. At all times relevant to the subject matter of this Complaint, Defendant Joseph Mensah ("Mensah") was a citizen of the United States and a resident of and domiciled in the State of Wisconsin. At all relevant times, Defendant Mensah was acting within the scope of his official duties and employment under color of state law in his capacity as a law enforcement officer employed by the Wauwatosa Police Department. Defendant Mensah is being sued in his individual and official capacities.

15. At all times relevant to the subject matter of this Complaint, Defendant Barry Weber ("Weber") was a citizen of the United States and a resident of and domiciled in the State of Wisconsin. At all relevant times, Defendant Weber was acting within the scope of his official duties and employment under color of state law in his capacity as a law enforcement officer and police chief employed by the Wauwatosa Police Department. Defendant Weber is being sued in his official capacity.

## IV. BACKGROUND

### A. National Epidemic of Police Killing Young Men of Color

16.  Homicides of citizens by law enforcement officers are an all-too-common occurrence in the United States.  In 2019 alone, 1098 people were killed by law enforcement officers[1].

17.  2019 was no outlier. Year after year, police in America kill over 1,000 individuals. Many of these individuals are unarmed and many are people of color.

18.  According to data collected by the Washington Post, since January 1, 2015, 233 people have been shot and killed by a police officer while unarmed. https://www.washingtonpost.com/graphics/investigations/police-shootings-database/

19.  Between 2013 and October 4, 2020, officers were only criminally charged in less than 2% of all occasions when their use of force resulted in death.[2]

20.  Violence by law enforcement against African American people in the United States is a national crisis. See Jennifer Bjorhus & MaryJo Webster, Convicted But Still Policing, Star Tribune (Oct. 1, 2017, 12:00 AM), http://www.startribune.com/minnesota-police-officers-convicted-of-serious-crimes-still-on-the-job/437687453/; Amanda Claire Curcio & Hunter Field, Deadly Force: In 6 years, 53 blacks shot by police in Arkansas, Arkansas Online (Mar. 13, 2017, 4:30 AM), http://www.arkansasonline.com/news/2017/mar/13/6-years-53-blacks-shot/; Wesley Lowery, Police are still killing black people. Why isn't it news anymore?, Wash. Post (Mar. 16, 2018), http://wapo.st/2p9NWyW?tid=ss_sms-amp; Carol Marbin Miller, Fight Club: A Miami Herald Investigation Into Florida's Juvenile Justice System, Miami Herald, http://www.miamiherald.com/news/special-reports/florida prisons/article176773291.html; Ben Montgomery, Why Cops Shoot, Tampa Bay Times (Apr. 5, 2017), http://www.tampabay.com/projects/2017/investigations/florida-police shootings/why-cops- shoot/; Eugene Scott, Police Shootings of unarmed black people have

---

[1] See https://mappingpoliceviolence.org/
[2] Id.

not ended. But top-level political conversations about them have. Wash. Post (March 22, 2018) http://wapo.st/2FXiQG0?tid=ss_sms-amp.

21. African Americans are three times more likely to be killed by law enforcement than Caucasians.

22. This violence against African Americans by police officers is particularly rampant in the State of Wisconsin. *Mesic et al., The Relationship Between Structural Racism and Black-White Disparities in Fatal Police Shootings at the State Level, 110, Journal of the National Medical Association, 106, 110 (2018).*

23. In Milwaukee County alone, twenty-seven (27) people have been killed by law enforcement officers over the past eight years. Twenty-two of those killed were African American.[3]

24. Even though only 26.4% of Milwaukee County's population is Black, 81.5% of all people killed by police officers in Milwaukee County were Black.

## B. Wauwatosa Police Department Embraces and Promotes Racism

25. From 1920 through at least the 1950's Wauwatosa was known as a restrictive zoning city in which African Americans were not welcome.[4] Even well into the 1960s it was not uncommon to see signs in Wauwatosa excluding Black people or seeing property deeds which explicitly "excluded non-whites from purchasing, owning, leasing or occupying."[5]

---

[3] See https://mappingpoliceviolence.org/, page contains a searchable database by law enforcement department

[4] https://www.jsonline.com/story/news/solutions/2019/06/18/centuries-old-racism-haunts-efforts-treat-milwaukee-traumaepidemic/2580146002/

[5] *Id.*

26.     Starting in 1919, the Washington Highlands subdivision included covenants that prohibited people of color from owning or occupying residential property within the subdivisions' boundaries.[6]

27.     In seven Wauwatosa subdivisions developed between 1945 and 1949, African American families were excluded.

28.     In the 1950s, even after the Supreme Court ruled that government enforcement of racially restrictive covenants violated the Equal Protection clause of the 14th Amendment, two new subdivisions inserted twenty-year prohibitions against Black ownership or occupancy of homes in those subdivisions.

29.     Approximately half of all residential land in Wauwatosa was subject to racially restrictive covenants over its history.

30.     Some of these restrictions reached into the 1980s.

31.     In the summer of 2020, a group of Wauwatosa residents called "Whites of Wauwatosa" distributed letters saying "Together we can keep Wauwatosa white. Together we can keep Wauwatosa safe."

32.     During a period in the late 1980s and early 1990s members of the WPD, including several members of the leadership team who were in place for decades, organized parties which they called "MLK parties."

33.     During these parties, members of the WPD dressed in black face while wearing names tags bearing the names of people of color.

34.     These parties were advertised, including in WPD buildings, using pictures of minorities arrested by the Wauwatosa Police.

---

[6] "Racially Restrictive Covenants: The Making of All-White Suburbs in Milwaukee County" Metropolitan Integration Research Center, 1979, at 2.

35. At these parties, there was literature from the Ku Klux Klan and other white supremacist organizations.

36. When these parties were investigated Barry Weber was the Wauwatosa Chief of Police, not a single officer who attended these parties, which numbered at least thirteen, was disciplined.

37. Instead, during the investigation into these racist parties, black face WPD participants and officers such as John Bozicevich, who hosted these parties at his house, were promoted by Defendant Weber.

38. A whistleblower clerk complained about the racism within the WPD and the MLK parties thrown and attended by many WPD officers. These allegations were brought to the attention of the municipality and the Fire and Police Commission.

39. The investigation revealed that WPD Officers Howard Bacon, David Breitlow, James Zalewski, John Bozicevish, Mark Tebo, Mark Presper, Roger Martens, Thomas Simon, Fred Carsky, Michael Reagles, Jeffrey Pruss, and Daniel Collins attended and/or hosted the racially divisive MLK parties.

40. The clerk also complained that even Defendant Weber caused problems for him.

41. Instead of addressing the custom of racism within the WPD, these officers were protected and promoted by the municipality and Defendant Weber.

42. Howard Bacon, a WPD officer and a guest at the MLK parties fired a revolver next to the clerk's head inside the WPD building, of which only later would he learn that the bullets had been blanks.

43. This was done in retaliation for the clerk's complaints about the racism that Bacon and his fellow officers displayed.

44. On April 6, 1990, acting Chief Frederick Basting brought charges against Howard Bacon for discharging his weapon in the police building, moving a fellow employee's car, creating a false report, and referring to a fellow employee in a degrading manner.

45. After Mr. Bacon retired in 2021, Defendant Weber rehired him until sometime in 2021 when he was asked to leave for asking a civilian community service officer to perform a sexual act on him.

46. Mr. Bacon's recent actions of misconduct in 2021 was never brought to the attention of the municipality or the Fire and Police Commission by Defendant Weber.

47. This is consistent with a culture, custom, and practice of closing ranks and protecting their own.

48. However, this failure to discipline, and instead a policy of promoting officers associated with the KKK, only emboldened racist policing in Wauwatosa.

49. The City of Wauwatosa is only 5.3% Black, yet in 2018, 83% of arrests were of Black people and 64% of traffic stops are of Black people.

50. And when Wauwatosa police officers stop Black people, they conduct on average a stop that is 16% longer than stops of white people.

51. It is not only the data which backs up the fact that Wauwatosa treats Black people differently than they treat white people.

52. It is known by Black people throughout the Milwaukee metropolitan area that you avoid driving through Wauwatosa because a police officer will find a reason to pull you over.

53. The WPD devalues people of color which is reflective in their over policing of Black people.

54. The WPD approaches Black and brown people as inherently suspicious.

55. And the WPD is more likely to use force on Black and brown people.

56. Defendant Weber was the police chief of the WPD from May 1990 until June 2021.

57. Jay Anderson, Jr. came to Wauwatosa, slept in Wauwatosa, and was killed in Wauwatosa.

## C. Joseph Mensah is Rewarded for his First Killing

58. Joseph Mensah has now killed three people.

59. For four (4) years and seven (7) months – Joseph Mensah killed three young men of color as a full-time active-duty Wauwatosa police officer.

60. These four years and seven months made Joseph Mensah one of the deadliest cops in American history.

61. Prior to hiring Joseph Mensah, the WPD never conducted any psychological evaluations.

62. The WPD had no indication of whether Mensah could deal with high stress situations.

63. Only seven months into his time as a police officer, Mensah killed his first victim.

64. On July 15, 2015, Joseph Mensah responded to a call about an intoxicated individual, Antonio Gonzales, threatening his boyfriend with a knife.

65. Antonio's boyfriend had informed the WPD that Antonio was extremely drunk. This information was conveyed to Mensah.

66. By the time Mensah arrived at the scene, Antonio's boyfriend was safe. In fact, no one was being threatened nor at risk of injury.

67. Nonetheless, Mensah immediately pulled out his gun.

68. When Antonio came out of his house, Mensah claimed he was holding a decorative samurai sword.

69. Mensah claimed that he shouted to Antonio to drop the sword.

70. Within seconds, Mensah fired his weapon eight times at Antonio which included one shot to the head and one shot to the back.

71. At no time was Mensah's safety at risk.

72. At no time was any other person's safety at risk.

73. For Mensah, the simple failure to follow an order related to a weapon gave him carte blanche permission to kill.

74. After this first killing, Mensah was placed on administrative leave.

75. Mensah never underwent a fitness for duty evaluation after he killed Antonio Gonzales. Instead, Chief Weber simply decided that Mensah was fine.

76. In fact, the WPD never had a fitness for duty policy nor any other policy to deal with officer involved shootings from July 15, 2015 through February 2, 2020.

77. Mensah never had a fitness for duty evaluation after he killed Antonio.

78. WPD failed to conduct an internal investigation of Antonio's shooting before he killed Jay Anderson, Jr.

79. In 2016, because the Milwaukee District Attorney's Office decided against filing criminal charges, Weber decided that the killing did not violate any policies; that the killing was justified; and that Mensah was fine to return to duty.

80. Apparently for Wauwatosa, so long as an officer is not charged with a crime, their conduct needs no review and their mental state requires no evaluation.

81. While Mensah was under investigation by the Milwaukee District Attorney for killing Jay Anderson, Jr. Weber awarded Mensah with a medal of valor for killing Gonzales.

82. As Weber would later recount, the courage was based on how Mensah conducted himself during that incident in protecting only himself.

83. Defendant Weber confirmed to Mensah that shooting to kill was not only justified, but that it was valorous.

84. On February 2, 2020 Mensah shot and killed seventeen-year-old Alvin Cole outside of Mayfair Mall.

85. Despite there being nearly a half a dozen WPD officers present, Mensah was the only officer who discharged his weapon shooting at Alvin Cole five times.

86. Defendant Mensah discharged his weapon nineteen times within a four year and seven month time period as a full-time active duty law enforcement officer with the Wauwatosa Police Department.

87. Defendant Mensah is responsible for approximately 12% of all deaths by police shootings in Milwaukee County from 2013 through October 4, 2020.

88. Defendant Mensah is responsible for 100% of all deaths by police shootings in the city of Wauwatosa since January 2011.

89. This case is the story of Joseph Mensah's second killing in his first sixteen (16) months as a Wauwatosa police officer.

## V.      FACTUAL ALLEGATIONS

90. Affectionately known as "Baby Jay" by his parents, Jay Anderson Sr. and Linda Anderson, as well as his friends, Jay was a kind man who had never been in a fight. He was loyal and loved being a father.

91. Around 1:30a.m. on June 23, 2016, Jay Anderson Jr. left a bar in Milwaukee where he had been hanging out with a friend.

92. Too tired to continue driving home, Jay decided that it would be safest for himself and everyone on the road if he pulled into a familiar park to sleep until he could safely drive home.

93. Jay chose the parking lot in Madison Park in Wauwatosa, Wisconsin.

94. Jay chose Madison Park because it was his favorite park. He would often bring his daughter, J.A. to Madison Park to play.

95. It was his safe place.

96. When Jay pulled into Madison Park, he had not committed any crime.

97. When Jay pulled into Madison Park, he had not threatened to commit any crime nor violence against any person.

98. While in Madison Park, Jay never committed a crime.

99. While in Madison Park, Jay never threatened any person nor was there a threat that he would commit any crime.

100. While in Madison Park, no one made a complaint about Jay Anderson.

101. From approximately 1:30 a.m. until 3:00 a.m. Jay simply slept in his car at Madison Park.

102. Jay was in the park for nearly one and a half hours sleeping before he was approached by Defendant Mensah at approximately 3:00 a.m.

103. Pursuant to a self-professed belief in protective policing, Mensah decided to go outside of his assigned patrol area and went looking for people to police in Madison Park.

104. Mensah encountered Jay sleeping in his car.

105. Mensah, having learned the lessons of a police department rife with racism and racial discrimination, immediately decided that a Black man sleeping in his car was suspicious and dangerous.

106. Mensah did not immediately call for backup.

107. Mensah did not turn on his blue and red lights as required by WPD policy.

108. Mensah did not turn on his audio recorder microphone as required by WPD policy.

109. Mensah intentionally chose to not record the incident.

110. Instead, he sought to confront a man asleep in his car in the parking lot of a community park at 3:00 a.m.

111. Without any crime or suspicion of the commission of a crime, Mensah aggressively knocked on Jay Anderson's window.

112. Apparently groggy and intoxicated Jay struggled to wake up.

113. Defendant Mensah viewed this as a lack of cooperation and almost immediately pulled his gun and pointed it at Jay's head.

114. Mensah ordered Jay to wake up – which he did.

115. Mensah ordered Jay to roll down his window – which he did.

116. Mensah ordered Jay to answer his questions – which he did.

117. Mensah ordered Jay to raise his hands – which he did.

118. Having killed before, Mensah approached every situation as one in which his life was in danger and he would be required to use his weapon at a moments' notice.

119. Jay kept his hands up while he and Defendant Mensah talked.

120. It is unclear what that conversation entailed due to the fact that Mensah failed to turn on his microphone and the squad video.

121. During the next four minutes, Jay Anderson struggled to keep his hands up because he was tired and intoxicated.

122. Defendant Mensah continually barked only one order at Jay which was to keep his hands up.

123. Defendant Mensah kept his gun inexplicably pointed at Jay's head who had his hands up during the majority of the interaction.

124. Jay never touched any weapon during the entire interaction with Defendant Mensah.

125. Defendant Mensah decided that he would kill Jay Anderson this night.

126. Mensah quickly emptied his gun.

127. He put three bullets into Jay Anderson's head.

128. Three bullets.

129. Each bullet to Jay's head was a kill shot.

130. All three bullets were later determined to have no up, down, left, or right trajectory deviation.

131. One bullet entered Jay's right ear and exited his left.

132. A fourth bullet struck Jay in the top of his shoulder, inches below his head.

133. A fifth bullet hit the headrest in Jay's seat.

134. A sixth bullet hit the back window behind Jay's seat which was also aimed at Jay's head.

135. Defendant Mensah had not sought to stop Jay Anderson, Jr.

136. Defendant Mensah was not in fear of his safety.

137. Upon killing Jay, Mensah made no effort to provide medical care.

138. He knew that Jay was dead. That was his intent.

139. Throughout the entire encounter, Jay never committed a crime.

140. Throughout the entire encounter, Jay never threatened to commit a crime.

141. Throughout the entire encounter, Jay never touched, pointed, or threatened to touch a weapon.

142. Throughout the entire encounter, Jay never threatened Defendant Mensah or any other person.

143. And throughout the entire encounter, Jay complied with every order given by Defendant Mensah who viewed Jay as a suspicious Black man.

144. Defendant Mensah's use of deadly force against Jay was not justified.

145. Jay Anderson leaves behind his fiancé of many years and his beautiful daughter, J.A. who will never know this kind man.

146. J.A. has been forced to know her father through pictures and memorials – to become one of the youngest leaders of a national movement that says that police too often approach Black men as violent – as people who have to prove they're not violent before they can be approached by a police officer without a hand on his gun.

147. J.A. will grow up hearing her father's name not just from her grandparents' at birthday parties and get-togethers, but also in response to chants of "Say His Name" in recognition of the deadly violence done to too many young men of color in this country by police officers.

148. On October 21, 2020 Jay's parents and fiancée filed a John Doe petition with the Milwaukee    County Circuit Court in case 20 JD 15 to find probable cause that Defendant Mensah committed a crime when he killed Jay Anderson, Jr. on June 23, 2016.

149. After listening to months of testimony, on July 28, 2021, Judge Yahamiro agreed that there was probable cause to charge Defendant Mensah for the crime of killing Jay Anderson, Jr.

150. On October 27, 2021 Judge Yamahiro will appoint a special prosecutor to investigate the execution of Jay Anderson, Jr. by Defendant Mensah.

**A. Defendant Wauwatosa's customs, policies, and/or practices within the WPD caused violations of Jay Anderson's constitutional rights.**

151. WPD Defendants' treatment of Jay was pursuant to Wauwatosa's custom, policy and/or practice of unlawful conduct, including but not limited to: racially-biased policing; aggression and violence when policing Black people; using excessive force in its law enforcement practices, particularly against Black people; unlawfully detaining, arresting, or charging people, particularly Black people, in order to cover up and justify unconstitutional uses of excessive force; failing to discipline officers, or even find the officers engaged in wrongdoing, in the face of obvious constitutional violations; and failing to adequately train and supervise WPD officers.

152. Wauwatosa has a longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of condoning and ratifying use of excessive force, particularly against Black people. As a result, it has become customary among police officers to use unjustified and excessive force, particularly against Black people, because Wauwatosa has communicated to WPD officers that such force is authorized and, indeed, expected, and when used will be defended or covered up by the supervisory and municipal apparatus of the City.

153. It is the longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of Wauwatosa to encourage or tolerate law enforcement officers to use race and race-based animus as motivating factors in police decisions and actions, as well as to fail to supervise and train WPD officers in the rights of individuals to be free from such

race-based decision making in law enforcement. This custom, policy, and/or practice has led to Wauwatosa police officers, on a regular basis, using elevated and unjustified levels of force against Black people.

154. It is the longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of Wauwatosa to permit law enforcement officers to use any hesitation to comply with an officer's (legal or illegal) commands—even when officer safety is not jeopardized by the hesitation—as justification to use force. In other words, Wauwatosa police officers commonly demand immediate and complete submission, especially by Black people, to any police directive, no matter the command. Failure to utterly and immediately submit customarily triggers hostility, aggression, and violence by Wauwatosa police officers. This custom, policy, and/or practice has led to Wauwatosa police officers, on a regular basis, using elevated levels of force, especially against Black people, including Jay Anderson.

155. Wauwatosa's unconstitutional customs, policies, and practices are further demonstrated by its history of race-based discrimination and brutality as reflected in both a statistical analysis of its policing and by the many cases brought by the victims of such brutality, and its additional misconduct and cover-up after killing Jay Anderson, Jr.

156. In addition, many other instances of Defendant Wauwatosa's similar constitutional violations show that use of excessive force by WPD officers, especially against Black people and other people of color, is customary and the standard operating procedure in the City of Wauwatosa Police Department, as is racially biased policing. This pernicious, racist custom and practice persists today.

157. For example, throughout 2020-2021, the WPD has developed and maintained a list of people they perceived as consistent protestors associated with the People's Revolution which is a mix of various community members protesting in support of Black Lives Matter and the three families of Alvin Cole, Jay Anderson, Jr., and Antonio Gonzales.

158. On February 2, 2020, Officer Mensah shot and killed Alvin Cole, Mensah's third killing of a person of color in less than five years. Cole who was on his knees when confronted by Mensah was of no risk to any other person when Mensah shot at him five times including in the back.

159. On September 2, 2019, WPD officers pulled over a car with two white women, Sandra Adams and Paulette Carter and one young Black man, Akil Carter, in it. Paulette Carter is Akil Carter's grandmother. When WPD officers approached the car, they ordered only Mr. Carter out of the car and drew their weapons. The officers, without any reasonable suspicion, ordered Mr. Carter to the ground, where he was handcuffed and arrested. When confronted later, the police manufactured a story about being flagged down by two fake witnesses who told them that two African American males had hijacked a blue Lexus. Even though WPD equips all squad cars with cameras, the WPD officers conveniently never turned their cameras on. *See Wisconsin Eastern District Court Case 19 CV 1422*.

160. On August 10, 2006, WPD officers responded to a reported armed robbery by a Black man wearing a red shirt. That same evening, Aaron Lawrence, wearing different attire, was chased and tackled by WPD officer Lewandowski. After he was taken to the ground and handcuffed, officer Lewandowski searched for a weapon. Lewandowski never found one. Nonetheless, Lewandowski used his taser several times on Mr. Lawrence, even though Mr. Lawrence had committed no crime and had made no threats against any individual. At one

point, Lewandowski was applying significant pressure to Mr. Lawrence's back, causing him to have difficulty breathing. His inability to speak as a result led Lewandowski to tase him again several times for not responding.

161. On August 8, 2002 WPD officers responded to a report of a robbery by a Black woman. Ms. Alfrieda Durrah had the misfortune of being the first Black female the WPD encountered. Even though she did not fit the description of the suspect other than being a Black woman, and was just leaving her office job in work attire, she was surrounded by WPD officers with their guns drawn and pointed at her. They ordered her to the ground where they kneeled on her back and handcuffed her. At no point did they have any reasonable suspicion that Ms. Durrah had committed a crime. Although the police were able to corroborate that Ms. Durrah was not their suspect, they nonetheless took her back to the police station and placed her in a cell.

162. On June 25, 1996, Adrian Patterson was subjected to excessive force by WPD officers. In his complaint, he stated that Timothy Brenzel hurled racial slurs at him while in custody. Timothy Brenzel was a detective for the WPD.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourth Amendment**
**Excessive Force**
**(Estate of Jay Anderson, Jr. against All Defendants)**

163. Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth herein.

164. At all times relevant to the allegations in this Complaint, the above-named Defendants were "persons" for purposes of 42 U.S.C. § 1983, were acting under color of state law, and were acting within the scope of their official duties and employment in their capacities as officers of the WPD.

165. Under the Fourth Amendment, as incorporated against the states by the Fourteenth Amendment, Decedent Jay Anderson, Jr. had a clearly established constitutional right to be secure in his person against unreasonable seizures through the use of excessive force.

166. Under the application of the specific facts and totality of circumstances as described herein, Mensah violated Mr. Anderson's clearly established constitutional rights.

167. Any reasonable law enforcement officer knew or should have known of these clearly established rights at the time of Mr. Anderson's death.

168. Defendant Mensah did not have a valid legal basis to seize Mr. Anderson. There was no reasonable suspicion or probable cause to believe that Mr. Anderson had committed any crimes.

169. Defendant Mensah did not have a valid legal basis to seize Mr. Anderson by killing him.

170. Defendant Mensah seized Mr. Anderson by means of objectively unreasonable and excessive force when he had no reasonable belief that Mr. Anderson had committed or was going to commit a crime or posed a threat to any officer or other person.

171. Defendant Mensah engaged in the use of deadly force that was objectively unreasonable in light of the facts and circumstances, violating Mr. Anderson's Fourth Amendment rights.

172. By shooting at Mr. Anderson with the express intent to kill him, Mensah's actions were not objectively reasonable.

173. By aiming for Mr. Anderson's head, Mensah's actions were objectively unreasonable.

174. Defendant Mensah's actions, as described here, were objectively unreasonable in light of the facts and circumstances confronting him.

175. Any reasonable officer in his position should have known that it was unreasonable to use the amount and type of force used and that to do so would violate Mr. Anderson's clearly established constitutional rights.

176. Any reasonable officer in his position should have known that it was unreasonable to intentionally fire at another person's head and to use force with the express intention to kill the other person and that to do so would violate Mr. Anderson's clearly established constitutional rights.

177. Defendant Mensah's excessive force caused Mr. Anderson to be unlawfully seized and thereby caused his death.

178. Defendant Mensah's actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Mr. Anderson's federally protected rights and he engaged in these actions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Anderson's constitutionally protected rights.

179. The acts of Mensah were pursuant to the customs, practices, policies, and/or training of Defendant Wauwatosa and Defendant Weber.

180. As alleged in detail above, Defendant Wauwatosa and Defendant Weber have a custom, policy, and practice of encouraging, condoning, tolerating, ratifying, and even rewarding the use of excessive force by Defendant Mensah. This is manifested through, among other things, WPD's grossly inadequate training, supervision, and discipline of Defendant Mensah relating to the use of excessive force.

181. Defendants Weber and Wauwatosa were on notice of WPD's defective customs, policies, and/or practices before Mensah's excessive use of force against Mr. Anderson.

182.    The need for adequate mental health evaluations, effective policies related to officer involved shootings, adequate hiring procedures, additional and effective use of force policies, training, and/or supervision was obvious and Defendants Wauwatosa and Weber exhibited deliberate indifference to the known and substantial risk of harm to Mr. Anderson and others by failing to create adequate mental health evaluation policies, effective policies related to officer-involved shootings, adequate hiring procedures, and adequate use of force policies and/or to adequately train or supervise WPD officers in the use of force.

183.    Defendants Weber and Wauwatosa's failure to create and implement adequate use of force policies and/or to adequately train and/or supervise WPD officers in the use of force was substantially certain to cause WPD officers to violate the constitutional rights of individuals like Mr. Anderson to be free from excessive force and these Defendants consciously or deliberately chose to disregard this risk in failing to change the use of force policies and/or adequately train and/or supervise WPD officers in the use of force. These acts and/or omissions constituted a deliberate choice by Weber and Wauwatosa among several alternatives to pursue a course of action regarding creating and implementing policies, training, and supervision in the area of use of force.

184.    Defendants Weber and Wauwatosa set in motion a series of events they knew would cause Mr. Anderson, or an individual in a similar situation as Mr. Anderson, to be deprived of his constitutional right to be free from excessive force.

185.    But for the above acts or omissions of Weber and Wauwatosa, Mensah would not have violated Mr. Anderson's constitutional rights, and such a deprivation was a natural and foreseeable consequence of Defendants Weber and Wauwatosa's acts and omissions.

186. The herein described acts or omissions of Defendant Wauwatosa, Former Chief Weber, and Former WPD Officer Mensah were the moving force behind the violation of Mr. Anderson's constitutional right to be free from excessive force and proximate cause of Plaintiff Estate's significant injuries, damages, and losses, including Mr. Anderson's death.

187. The herein described acts or omissions of the Defendant Wauwatosa, Former Chief Weber, and Former WPD Officer Mensah were the moving force and the legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but not limited to Mr. Anderson's death, the physical and mental pain and anguish Mr. Anderson suffered before and during his death, the loss of Mr. Anderson's relationship and companionship with his family and friends, the loss of Mr. Anderson's constitutional rights, his loss of enjoyment of life, and other compensatory and special damages including but not limited to Mr. Anderson's permanent lost earnings and earnings capacity, medical bills, and funeral expenses.

188. The intentional actions or inactions of Defendant Wauwatosa, Weber, and Mensah, as described herein, intentionally deprived Mr. Anderson of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**Denial of Equal Protection**
**(Estate of Jay Anderson, Jr. against All Defendants)**

189. Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth herein.

190. At all times relevant to the allegations in this Complaint, the above-named Defendants were "persons" for purposes of 42 U.S.C. § 1983, were acting under color of state law, and were

acting within the scope of their official duties and employment in their capacities as officers of the WPD.

191. At the time of the events at issue, Mr. Anderson had the clearly established constitutional right to be free from racial discrimination in law enforcement by police officers and to enjoy the equal protection of the laws.

192. Mr. Anderson's race was a motivating factor in Mensah's decision to seize him and to use excessive force against him. Mensah acted with the intent or purpose of depriving Mr. Anderson of the equal protection and benefits of the law, and equal privileges and immunities under the law, in violation of the Fourteenth Amendment.

193. Defendant Mensah treated Mr. Anderson less favorably—and with much more unreasonable force—than his similarly situated White counterparts, wholly or in part because he was Black.

194. Defendant Mensah acted with an intent or purpose to discriminate against Mr. Anderson based upon his race.

195. There was no rational basis for Mensah's discriminatory actions and inactions, let alone a purpose narrowly tailored to serve a compelling governmental interest.

196. Defendant Mensah seized and used excessive force against Mr. Anderson without reasonable suspicion or probable cause to believe that Mr. Anderson had committed a crime, posed a threat of harm to any other person, or was a flight risk that would legally justify the force used. The lack of any such reasonable suspicion or probable cause, along with WPD's long history of racially biased policing, are evidence that the seizure of Mr. Anderson by Mensah's use of force against him was motivated in whole or in part because of Mr. Anderson's race.

197. WPD officers' history and disproportionate use of excessive force against Black people provide evidence of discriminatory intent. WPD's clear pattern of disproportionate use of excessive force against Black people is unexplainable on grounds other than race.

198. WPD Defendants intentionally, willfully, unreasonably, and wantonly seized Mr. Anderson by using excessive force against him, and/or failing to intervene in the use of excessive force against him, wholly or in part because of his race.

199. Defendant Mensah' actions were objectively unreasonable considering the facts and circumstances confronting them.

200. Defendant Mensah engaged in these actions or inactions intentionally, willfully, maliciously, and wantonly, showing deliberate indifference to and reckless disregard of Mr. Anderson's federally protected constitutional rights.

201. Defendants Wauwatosa and Weber failed to properly train, supervise, and/or discipline its employees regarding the constitutional requirement not to engage in racially biased policing, resulting in the Mensah's unlawful seizure via the use of excessive force against Mr. Anderson. Defendants Wauwatosa and Weber particularly failed to properly train, supervise, and/or discipline its employees regarding the use of excessive force against Black people, and the prohibition on using race as a motivating factor in taking police actions, including the use of force.

202. Wauwatosa's inadequate training, supervision, and/or discipline resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant Wauwatosa.

203. Considering the duties and responsibilities of personnel of Defendant Wauwatosa — who must police and interact with Black people regularly—and the frequency with which such

law enforcement personnel will confront Black people while discharging their duties as law enforcement officers as described herein, the need for specialized training, supervision, and discipline regarding such decisions was so obvious, and the inadequacy of training and/or supervision was so likely to result in a violation of constitutional rights, such as those described herein, that Defendant Wauwatosa is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

204. Such failure to properly train, supervise, and/or discipline was a moving force behind and proximate cause of Mensah's racially biased treatment of Mr. Anderson, and makes up an unconstitutional policy, procedure, custom, and/or practice.

205. Wauwatosa exonerated Mensah for his racially biased conduct under Wauwatosa's municipal customs, policies and/or actual practices described herein. Such decision to exonerate racially discriminatory conduct was made deliberately and pursuant to Wauwatosa's longstanding customs and practices. The decision sends a clear message that Mensah acted pursuant to the customs, practices, and policies of Defendant Wauwatosa.

206. Defendant Wauwatosa's failure to adequately train and/or supervise, as well as the failure to take appropriate disciplinary or remedial action on past instances of similar unconstitutional conduct, as described herein, was a legal and proximate cause of Mr. Anderson's death.

207. As a direct and proximate result of Defendants' actions, Mr. Anderson lost his life and Plaintiff Estate has been and continues to be damaged by Mensah's racially motivated seizure via unreasonable use of excessive force. Mr. Anderson endured physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, loss of

consortium with his family and friends, and sense of security and individual dignity, and tragically the loss of his life at the age of 25.

208. The herein described acts or omissions of Defendant Wauwatosa Weber, and Mensah, were the moving force and the legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but not limited to Mr. Anderson's death, the physical and mental pain and anguish Mr. Anderson suffered before and during his death the loss of Mr. Anderson's relationship and companionship with his family and friends, the loss of Mr. Anderson's constitutional rights, his loss of enjoyment of life, and other compensatory and special damages including but not limited to Mr. Anderson's permanent lost earnings and earnings capacity, medical bills, and funeral expenses.

209. Defendants' intentional actions or inactions as described herein intentionally deprived Mr. Anderson of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America

### Third Claim for Relief
### 42 U.S.C. § 1983 – Fourth Amendment
### Loss of Society and Companionship
(J.A. Against Defendants Mensah and City of Wauwatosa)

210. Plaintiff realleges and incorporates by reference the allegations of all the preceding paragraphs.

211. At all times relevant to the allegations in this Complaint, the above-named Defendants were "persons" for purposes of 42 U.S.C. § 1983, were acting under color of state law, and were acting within the scope of their official duties and employment in their capacities as officers of the WPD.

212. The killing of Jay Anderson, Jr. was a violation of his constitutional right under the Fourth and Fourteenth Amendments.

213. In killing Jay Anderson, Jr., the Defendants intentionally inferred in J.A.'s familial relationship with her father, Jay Anderson, Jr.

214. At the time of the killing, J.A. was fifteen months old and had a constitutional interest and right in the familial relationship with her father.

215. In killing Jay Anderson, Jr., Defendants have denied J.A. the opportunity to spend time with her father, have denied J.A. the support that her father would give, and have deprived her of a life-long relationship with her father.

216. As a direct and proximate result of Defendants' actions, J.A. has suffered significant and irreparable injury.

217. That the conduct of Defendant Mensah, as set forth in the preceding paragraphs which resulted in the death of Jay Anderson, Jr, deprived Starkeisha Delarosa of the society and companionship of her fiancé.

### Fourth Claim for Relief
### Wisconsin Statute Section 895.46
### Indemnification against Wauwatosa

218. Plaintiffs reallege and incorporate by reference the allegations of all the preceding paragraphs.

219. At all times material hereto, Defendant Mensah was carrying out his duties as a WPD officer, and was acting within the scope of his employment with Wauwatosa.

220. The conduct of Mensah, as set forth in the preceding paragraphs resulted in the death of Jay Anderson, Jr.

221. Wauwatosa is liable, pursuant to Wisconsin Statute Section 895.46 for any judgment entered against Defendant Mensah in this action because at all times material hereto,

Mensah was carrying out his duties as a WPD officer, and was acting within the scope of his employment with Wauwatosa.

222. Defendant's Weber investigation and lack of any disciplinary actions were not complete and incompetent and/or constitute an attempted cover up Defendants Mensah's unlawful conduct.

223. The acts of the Mensah, including shooting and killing Mr. Anderson without any justification or reasonable suspicion, was done in accordance with the Wauwatosa and its Police Department's de-facto policy, regulation, decision or custom condoning excessive force in executing arrests, false arrests, and/or otherwise violating person's equal protection rights, including by the City's or in this case to date, Defendant Weber and Wauwatosa's, failure to adequately discipline Mensah for such violations. That these respective de-facto policies were officially adopted, expressly or implicitly, or promulgated or practiced or ratified by the Wauwatosa, through its Chief of Police Weber, and as such constitute a de-facto governmental custom in such department, even though such custom may not have received written formal approval by the City, and even though such de-facto policies are inconsistent with or even violate WPD's written policies.

224. This official or de facto policy or custom of utilizing excessive force, lethal force, and/or violating person's equal all in malicious or reckless disregard or with deliberate indifference to Mr. Anderson's Fourth and Fourteenth Amendment Rights by, among others, the Defendant Weber's failure to adequately discipline Mensah for his unlawful conduct and for Defendant's Weber continued failure to adequately supervise Mensah.

225. That this official or de-facto policy and custom of utilizing excessive force, lethal force, and/or violating person's equal protection rights arose and/or was allowed to continue as a

result of, among others, Wauwatosa and the WPD's failure to adequately supervise, discipline, and/or train its employees namely Defendant Mensah. Upon information and belief, the individual Defendant Mensah had used excessive lethal force particularly resulting in the death of an Antonio Gonzales who he shot at eight times killing him on July 15, 2015 after having been on the WPD's force for only seven months and eleven months before Defendant Mensah killed Jay Anderson, Jr.

226. That the described conduct on the part of all the Defendants, including the former chief of Police for the WPD Defendant Weber, in his official capacity, was a cause of the plaintiff's injuries, losses and damages as set forth herein.

227. That such conduct was intended to cause Mr. Anderson and was unnecessary and severe physical, psychological, and emotional injuries that resulted in his death.

228. That such conduct on the part of all the individual Defendants was a cause of the Mr. Anderson's death and causing also severe psychological and emotional damages, suffered by the petitioners.

229. At all times material hereto, the individual Defendants acted maliciously and/or with reckless disregard and/or with deliberate indifference towards Mr. Anderson or in an intentional disregard of his rights, his life and as such all Defendant's should be liable for any and all punitive damages suffered by petitioners.

230. The Defendant Wauwatosa is liable pursuant to Wis. Stat. § 895.46 for payment of any judgment entered against this individual employee Defendant in this action because said Defendant was acting within the scope of his employment when he committed the acts described above.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants, jointly and severally, as follows:

1.      Against Defendant Joseph Mensah in his individual and official capacity, for compensatory damages, for the violation of Mr. Anderson's rights, as set forth above, in an amount to be determined at a trial of this matter;

2.      Against Defendant Chief Barry Weber, in his official capacity, for compensatory damages for the violation of Mr. Anderson's rights, as set forth above, in an amount to be determined at a trial of this matter;

3.      Against Defendant Mensah for punitive damages for the violation of Mr. Anderson's rights, as set forth above, in an amount to be determined at a trial of this matter;

4.      Against Defendant Weber for punitive damages for the violation of Mr. Anderson's rights, as set forth above, in an amount to be determined at a trial of this matter;

5.      Against Defendant City of Wauwatosa for punitive and compensatory damages and for its liability pursuant to Wis. Stat. § 895.46 to indemnify the individual Defendants in an amount to be determined at a trial of this matter;

6.      For all costs, disbursements and actual without limitation, attorneys' fees  and expert fees pursuant to 42 U.S.C.A. § 1988(b) and (c);

7.      An award of prejudgment interest;

8.      Equitable and injunctive relief to prevent future violations of the law; and

9.      An order awarding such other and further relief as the Court deems just and equitable.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL OF THIS MATTER ON ALL ISSUES SO TRIABLE.**

Dated this 13th day of October, 2021.

Respectfully Submitted:

MOTLEY LEGAL SERVICES

ss:/ Kimberley Cy. Motley
Kimberley Cy. Motley
2206 Bonnie Butler Way
Charlotte, North Carolina 28270
Wisconsin State Bar No.: 1047193
Telephone: (704)763-5413
Email: kmotley@motleylegal.com


E. Milo Schwab
Ascend Counsel, LLC
2401 S Downing Street
Denver, CO 80210
Colorado State Bar No. : 47897
Telephone : (303) 888-4407
Email: milo@ascendcounsel.co