# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ESTATE OF JAY ANDERSON, Jr., by and through its
Special Administrator, Starkeisha DeLaRosa, and
J.A., through her next friend Starkeisha DeLaRosa.

               Plaintiffs,

    v.

JOSEPH MENSAH in his individual capacity,
BARRY WEBER, in his individual  capacity,
CITY OF WAUWATOSA,
CITIES AND VILLAGES MUTUAL INSURANCE
COMPANY, and
ABC INSURANCE COMPANY,

             Defendants.

Case No. 21-CV-1179

JURY TRIAL DEMANDED

---

## FIRST AMENDED COMPLAINT

Plaintiffs, by and through their attorneys Kimberley Cy. Motley, E. Milo Schwab, and Nathaniel Cade, Jr., respectfully allege for their Amended Complaint and Jury Demand as follows:

## I.   INTRODUCTION

1.   This is the story of one of the deadliest police officers in American history. Between July 16, 2015 and February 2, 2020, Joseph Mensah, a police officer for the City of Wauwatosa, killed three young men of color in three separate incidents. This Complaint tells the story of Joseph Mensah's second victim and a culture of policing in Wauwatosa which awarded his indifference for life, callousness towards killing, and racially discriminatory policing towards people of color. .

2. On June 23, 2016 at approximately 3:07 a.m. Joseph Mensah woke up Jay Anderson, Jr. and deliberately killed him.

3. There was no other possible result from Joseph Mensah's actions than the death of Jay Anderson, Jr.

4. Joseph Mensah intended to kill Jay Anderson, Jr.

5. It was not Defendant Joseph Mensah's first killing and unfortunately, it would not be his last.

6. This case is the story of how failures in policing, failures of leadership, and a city steeped in racial discrimination created the conditions which would lead one police officer to intentionally kill J.A's Father, Jay Anderson, Jr.

## II. JURISDICTION AND VENUE

7. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and the laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiffs' claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

8. Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(b). All events alleged herein occurred within Milwaukee County.

## III. PARTIES

9. At all times relevant to the subject matter of this Complaint, the decedent Jay Anderson Jr. was a citizen of the United States of American and a resident of and domiciled in the State

2

of Wisconsin. Jay Anderson Jr.'s fiancé and mother to his daughter J.A., Starkeisha Delarosa, is the representative of the Estate of Jay Anderson Jr.

10. Plaintiff J.A. is the minor child of Jay Anderson Jr. At all times relevant to the subject matter of this Complaint, the decedent was a citizen of the United States of America and a resident of and domiciled in the State of Wisconsin. J.A. is represented through her next friend, her mother Starkeisha Delarosa.

11. Defendant City of Wauwatosa, Wisconsin ("Wauwatosa"), is a municipality organized under the laws of the state of Wisconsin, and is a "person" subject to suit under 42 U.S.C. § 1983. The Wauwatosa Police Department ("WPD") is a law enforcement agency that is part of the City of Wauwatosa. At all times relevant to the subject matter of this Complaint, Defendant City of Wauwatosa was responsible for the oversight, supervision, discipline, and training of WPD personnel.

12. Defendant Barry Weber was the Police Chief of the Wauwatosa Police Department at all times relevant to this action. He oversaw the WPD in his official capacity. By law, custom, de-facto or otherwise, and/or delegation, he has policymaking authority over the police department for all actions at issue in this case. He is responsible for ensuring that the policies and practices of the WPD comply with federal and state requirements for the treatment of citizens like the Plaintiff. He is being sued in his individual capacity. At all times relevant to this action, Weber was acting under color of law and within the scope of his employment with the WPD and Wauwatosa.

13. Defendant Joseph Anthony Mensah hereinafter referred to as "Mensah" is an adult citizen and resident of the State of Wisconsin. He is being sued in his individual capacity. Defendant Mensah was an officer with the WPD at all times relevant to this action and was

acting under color of law and within the scope of his employment with the Wauwatosa Police Department for the City of Wauwatosa. Mensah was hired by the WPD on January 2, 2015.

14. Defendant Cities and Villages Mutual Insurance Company ("CVMIC") is a domestic insurance corporation authorized and licensed to do business in the State of Wisconsin for purposes of issuing insurance coverage policies, with Thomas E. Mann as its registered agent, doing business at offices located at 9898 West

Bluemound Road Wauwatosa, Wisconsin 53226. Upon information and belief, CVMIC issued a policy of liability insurance to the City of Wauwatosa, and all their employees and/or agents thereof. By the terms of said policy, CVMIC agreed to pay any and all sums for which Wauwatosa and/or their agents and employees might be held legally liable for injuries or damages caused by Wauwatosa and/or their employees and agents. Upon information and belief, said CVMIC insurance policy was in full force and effect during all time periods relevant here. Pursuant to Wis. Stat. § 803.04, CVMIC is a proper party to this action.

15. Defendant ABC Insurance Company, upon information and belief, is a domestic insurance company duly conducting business in the State of Wisconsin and is engaged in the business, among other things, of issuing policies of insurance within the State of Wisconsin. Upon information and belief, prior to and including all relevant times herein, ABC issued a policy of liability insurance to the City of Wauwatosa and all its employees and/or agents thereof. By the terms of said policy, ABC agreed to pay any and all sums for which Wauwatosa and/or its agents and employees might be held legally liable for injuries or damages caused by Wauwatosa

and/or its employees and agents. Upon information and belief, said ABC insurance policy was in full force and effect during all time periods relevant here. Pursuant to Wis. Stat. § 803.04, ABC Insurance Company is a proper party to this action.

## IV. BACKGROUND

### a. The Wauwatosa Police Department Embraces and Promotes Racism

16.    From 1920 through at least the 1950's Wauwatosa was known as a restrictive zoning city in which African-Americans were not welcome.[1] Even well into the 1960s it was not uncommon to see signs in Wauwatosa excluding Black people or seeing property deeds which explicitly "excluded non-whites from purchasing, owning, leasing or occupying."[2]

17.    Starting in 1919, the Washington Highlands subdivision included covenants that prohibited people of color from owning or occupying residential property within the subdivisions' boundaries.[3]

18.    In seven Wauwatosa subdivisions developed between 1945 and 1949, African-American families were excluded.

19.    In the 1950s, even after the Supreme Court ruled that government enforcement of racially restrictive covenants violated the Equal Protection clause of the 14th Amendment, two new subdivisions inserted twenty-year prohibitions against Black ownership or occupancy of homes in those subdivisions.

20.    Approximately half of all residential land in Wauwatosa was subject to racially restrictive covenants over its history. Some of these restrictions were effective in the 1980s.

---

[1] https://www.jsonline.com/story/news/solutions/2019/06/18/centuries-old-racism-haunts-efforts-treat-milwaukee-traumaepidemic/2580146002/
[2] *Id.*
[3] "Racially Restrictive Covenants: The Making of All-White Suburbs in Milwaukee County" Metropolitan Integration Research Center, 1979, at 2.

21. In the summer of 2020, documents from "Whites of Wauwatosa" were distributed stating that "Together we can keep Wauwatosa white. Together we can keep Wauwatosa safe."

22. During a period in the late 1980s and early 1990s several members of the WPD, including several officers who would serve in leadership roles until their retirement only several years ago and who were promoted shortly after by Defendant Weber while these parties were investigated , organized parties which they called "MLK parties."

23. During these parties, members of the WPD dressed in black face while wearing names tags bearing the names of people of color.

24. These parties were advertised, including in WPD buildings, using pictures of minorities arrested by the Wauwatosa Police.

25. At these parties, there was literature from the Ku Klux Klan and other white supremacist organizations.

26. When these parties were investigated, Barry Weber was the Wauwatosa Chief of Police.

27. No officer who attended these parties, which numbered at least thirteen, was properly disciplined for their racist conduct.

28. The Wauwatosa Police Department never instituted any policy, training, or any of action to confront the deep-seated racism pervasive throughout its ranks.

29. Instead, during the investigation into these racist parties, black face WPD participants and officers such as John Bozicevich, who hosted these parties at his house, were promoted by Defendant Weber to supervisory positions while the investigations into the parties were underway.

30. A whistleblower clerk complained about the racism within the WPD and the MLK parties thrown and attended by many WPD officers. These allegations were brought to the attention of the municipality and the Fire and Police Commission.

31. The investigation revealed that WPD Officers Howard Bacon, David Breitlow, James Zalewski, John Bozicevich, Mark Tebo, Mark Presper, Roger Martens, Thomas Simon, Fred Carsky, Michael Reagles, Jeffrey Pruss, and Daniel Collins attended and/or hosted the racially divisive MLK parties.

32. The clerk also complained that even Defendant Weber caused problems for him.

33. Instead of addressing the custom of racism within the WPD, these officers were protected and promoted by the municipality and Defendant Weber.

34. Howard Bacon, a WPD officer and a guest at the MLK parties fired a revolver next to the clerk's head inside the WPD building, of which only later would he learn that the bullets had been blanks.

35. This was done in retaliation for the clerk's complaints about the racism that Bacon and his fellow officers displayed.

36. After Mr. Bacon retired in December 2012, Defendant Weber rehired Mr. Bacon sometime in 2021, soon after being rehired Bacon was asked to resign for asking a civilian community service officer to perform a sexual act on him.

37. Mr. Bacon's recent actions of misconduct in 2021 was never brought to the attention of the municipality or the Fire and Police Commission by Defendant Weber.

38. This is consistent with WPD's culture, custom, and practice of closing ranks and protecting their own.

39. This failure to discipline, and policy of promoting officers associated with racially insensitive actions , only emboldened racist policing in Wauwatosa.

40. In 2018, the City of Wauwatosa's population was reported as being only 5.3% Black, yet in 2018, 83% of arrests were of Black people and 64% of traffic stops were of Black people.

41. In 2016, the City of Wauwatosa received state and federal grants of which some monies were used towards its police department.

42. And when Wauwatosa police officers stop Black people, they conduct on average a stop that is 16% longer than stops of white people.

43. It is not only the data which backs up the fact that Wauwatosa treats Black people differently than they treat white people.

44. It is known by Black people throughout the Milwaukee metropolitan area to avoid driving through Wauwatosa because a police officer will find a reason to pull Black people over.

45. The WPD devalues people of color which is reflective in their over policing of Black people.

46. The WPD approaches Black and brown people as inherently suspicious.

47. And the WPD is more likely to use force on Black and brown people.

**b.    Joseph Mensah is Rewarded for his First and Third Killing**

48. To date, Joseph Mensah has killed three people. For four (4) years and seven (7) months – Joseph Mensah killed three young men of color as a full active-duty Wauwatosa police officer.

49. These first four years and seven months made Joseph Mensah one of the deadliest cops in American history.

50. Prior to hiring Joseph Mensah, the WPD never conducted any psychological evaluations.

51.   The WPD had no indication of whether Mensah could deal with high stress situations.

52.   Only seven months into his time as a police officer, Mensah killed his first victim.

On July 15, 2015, Joseph Mensah responded to a call about an intoxicated individual, Antonio Gonzales, threatening his boyfriend with a knife.

53.   Antonio's boyfriend had informed the WPD that Antonio was extremely drunk. This information was conveyed to Mensah.

54.   By the time Mensah arrived at the scene, Antonio's boyfriend was safe. In fact, no one was being threatened nor at risk of injury.

55.   Nonetheless, Mensah immediately pulled out his gun.

56.   When Antonio came out of his house, Mensah claimed he was holding a decorative samurai sword.

57.   Mensah claimed that he shouted to Antonio to drop the sword.

58.   Within seconds, Mensah fired his weapon eight times at Antonio which included one shot to the head and one shot to the back.

59.   At no time was Mensah's safety at risk.

60.   At no time was any other person at risk.

61.   For Mensah, the simple failure to follow an order related to a weapon gave him carte blanche permission to kill.

62.   After this first killing, Mensah was briefly placed on administrative leave but was back out on the streets less than four months after killing Antonio Gonzales..

63.   Mensah never underwent a fitness for duty evaluation after he killed Antonio Gonzales. Instead, Chief Weber simply decided that Mensah was fine.

9

64.     In fact, the WPD never had a fitness for duty policy nor any other policy in response to deal with officer involved shootings from July 15, 2015 through February 2, 2020.

65.     WPD failed to conduct an internal investigation of Antonio's shooting before he killed Jay Anderson, Jr.

66.     In 2016, because the Milwaukee District Attorney's Office decided against filing criminal charges, Weber decided that the killing did not violate any policies; that the killing was justified; and that Mensah was fine to return to duty.

67.     Apparently for Wauwatosa, so long as an officer is not charged with a crime, their conduct needs no review and their mental state requires no evaluation.

68.     While Mensah was under investigation by the Milwaukee District Attorney for killing Jay Anderson, Jr. Weber awarded Mensah with a medal of valor for killing Gonzales.

69.     As Weber would later recount, the courage was based on how Mensah conducted himself during that incident in protecting only himself.

70.     Weber confirmed to Mensah that shooting to kill was not only justified, but that it was valorous.

71.     On February 2, 2020 Mensah shot and killed seventeen-year-old Alvin Cole outside of Mayfair Mall.

72.     Despite there being nearly a dozen WPD officers present, Mensah was the only officer who discharged his weapon shooting at Alvin Cole five times.

73.     Mensah is responsible for approximately 12% of all deaths by police shootings in Milwaukee County from 2013 through October 4, 2020.

74.     Defendant Mensah is responsible for 100% of all deaths by police shootings in the city of Wauwatosa since January 2011.

75. This case is the story of Joseph Mensah's second killing in his first sixteen (16) months as a Wauwatosa police officer.

## V.  FACTUAL ALLEGATIONS

76. Affectionately known as "Baby Jay" by his parents, Jay Anderson Sr. and Linda Anderson, as well as his friends, Jay was a kind man who had never been in a fight. He was loyal and loved being a father to his then sixteen month old daughter.

77. Around 1:30a.m. on June 23, 2016, Jay Anderson Jr. left a bar in Milwaukee where he had been hanging out with a friend.

78. Too tired to continue driving home, Jay decided that it would be safest for himself and everyone on the road if he pulled into a familiar park to sleep until he could safely drive home.  Jay chose the parking lot in Madison Park in Wauwatosa, Wisconsin.

79. Jay chose Madison Park because it was his favorite park. He would often bring his daughter, J.A. to Madison Park to play.  It was his safe place.

80. When Jay pulled into Madison Park, he had not committed any crime.

81. When Jay pulled into Madison Park, he had not threatened to commit any crime nor violence against any person.

82. While in Madison Park, Jay never committed a crime.

83. While in Madison Park, Jay never threatened any person nor was a threat to commit any crime.

84. While in Madison Park, no one made a complaint about Jay Anderson.

85. From approximately 1:30 a.m. until 3:00 a.m. Jay simply slept in his car.

86.  Jay was in the park for nearly one and a half hours sleeping before he was approached by Defendant Mensah at approximately 3:00 a.m.

87.  Pursuant to a self-professed belief in proactive policing, Mensah decided to go outside of his assigned patrol area and went looking for people to police in Madison Park.

88.  Mensah encountered Jay sleeping in his car.

89.  Mensah, having learned the lessons of a police department rife with racism and racial discrimination, immediately decided that a Black man sleeping in his car was suspicious and dangerous.

90.  Mensah did not immediately call for backup.

91.  Mensah did turn on his blue and red lights as required by WPD policy.

92.  Mensah did not begin his dash recoding as required by WPD policy.

93.  Mensah did not begin audio recording as required by WPD policy.

94.  Mensah intentionally chose to not video or audio record the incident in real time.

95.  Instead, he sought to confront a man asleep in his car in the parking lot of a community park at 3:00 a.m.

96.  Without any crime or suspicion of the commission of a crime, Mensah aggressively knocked on Jay Anderson's window.

97.  Apparently groggy and intoxicated Jay struggled to wake up.

98.  Defendant Mensah viewed this as a lack of cooperation and almost immediately pulled his gun and pointed it at Jay's head.

99.  Mensah ordered Jay to wake up – which he did.

100.  Mensah ordered Jay to roll down his window – which he did.

101.  Mensah ordered Jay to answer his questions – which he did.

102. Mensah ordered Jay to raise his hands – which he did.

103. Having killed before, Mensah approached every situation as one in which his life was in danger and he would be required to use his weapon at any moments' notice.

104. Jay kept his hands up while he and Defendant Mensah talked.

105. It is unclear what that conversation entailed due to the fact that Mensah failed to turn on his microphone and the squad video.

106. During the next four minutes, Jay Anderson struggled to keep his hands up because he was tired and intoxicated.

107. Defendant Mensah continually barked only one order at Jay which was to keep his hands up.

108. Defendant Mensah kept his gun inexplicably pointed at Jay's head who had his hands up during the majority of the interaction.

109. Jay never touched any weapon during the entire interaction with Defendant Mensah.

110. Defendant Mensah decided that he would kill Jay Anderson this night.

111. Mensah quickly emptied his gun.

112. He put three bullets into Jay Anderson's head.

113. Each bullet to Jay's head was a kill shot.

114. All three bullets were later determined to have no up, down, left, or right trajectory.

115. One bullet entered Jay's right ear and exited his left.

116. A fourth bullet struck Jay in the top of his shoulder, inches below his head.

117. A fifth bullet hit the headrest in Jay's seat.

118. A sixth bullet hit the back window behind Jay's seat which was also aimed at Jay's head.

119.  Defendant Mensah had not sought to stop Jay Anderson, Jr.

120.  Defendant Mensah was not in fear of his safety.

121.  Upon killing Jay, Mensah made no effort to provide medical care.

122.  He knew that Jay was dead. That was his intent.

123.  Throughout the entire encounter, Jay never committed a crime.

124.  Throughout the entire encounter, Jay never threatened to commit a crime.

125.  Throughout the entire encounter, Jay never touched, pointed, or threaten to touch a weapon.

126.  Throughout the entire encounter, Jay never threatened Defendant Mensah or any other person.

127.  And throughout the entire encounter, Jay complied with every order given by Defendant Mensah who viewed Jay as a suspicious Black man.

128.  Defendant Mensah's use of deadly force against Jay was not justified.

129.  Jay Anderson leaves behind his fiancé of many years and his beautiful daughter, J.A. who will never know this kind man.

130.  J.A. has been forced to know her father through pictures and memorials – to become one of the youngest leaders of a national movement that says that police too often approach Black men as violent – as people who have to prove they're not violent before they can be approached by a police officer without a hand on his gun.

131.  J.A. will grow up hearing her father's name not just from her grandparents' at birthday parties and get-togethers, but also in response to chants of "Say His Name" in recognition of the deadly violence done to too many young men of color in this country by police officers.

14

132. On October 21, 2020 Jay's parents and fiancée filed a John Doe petition with Milwaukee County Circuit Court Judge Yamahiro in case 20 JD 15 to find probable cause that Defendant Mensah committed a crime when he killed Jay Anderson, Jr. on June 23, 2016.

133. After listening to months of testimony, on July 28, 2021, Judge Yamahiro agreed that there was probable cause to charge Defendant Mensah for the crime of killing Jay Anderson, Jr.

### A. Defendant Wauwatosa's customs, policies, and/or practices within the WPD caused violations of Jay Anderson's constitutional rights.

134. WPD Defendants' treatment of Jay was pursuant to Wauwatosa's custom, policy and/or practice of unlawful conduct, including but not limited to: racially-biased policing; aggression and violence when policing Black people; using excessive force in its law enforcement practices, particularly against Black people; unlawfully detaining, arresting, or charging people, particularly Black people, in order to cover up and justify unconstitutional uses of excessive force; failing to discipline officers, or even find the officers engaged in wrongdoing, in the face of obvious constitutional violations; and failing to adequately train and supervise WPD officers.

135. Wauwatosa has a longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of condoning and ratifying use of excessive force, particularly against Black people. As a result, it has become customary among police officers to use unjustified and excessive force, particularly against Black people, because Wauwatosa has communicated to WPD officers that such force is authorized and, indeed, expected, and when used will be defended or covered up by the supervisory and municipal apparatus of the City.

136. It is the longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of Wauwatosa to encourage or tolerate law enforcement officers to use race and race-based animus as motivating factors in police decisions and actions, as well as to fail to supervise and train WPD officers in the rights of individuals to be free from such race-based decision making in law enforcement. This custom, policy, and/or practice has led to Wauwatosa police officers, on a regular basis, using elevated and unjustified levels of force against Black people.

137. It is the longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of Wauwatosa to permit law enforcement officers to use any hesitation to comply with an officer's (legal or illegal) commands—even when officer safety is not jeopardized by the hesitation—as justification to use force. In other words, Wauwatosa police officers commonly demand immediate and complete submission, especially by Black people, to any police directive, no matter the command. Failure to utterly and immediately submit customarily triggers hostility, aggression, and violence by Wauwatosa police officers. This custom, policy, and/or practice has led to Wauwatosa police officers, on a regular basis, using elevated levels of force, especially against Black people, including Jay Anderson.

138. Wauwatosa's unconstitutional customs, policies, and practices are further demonstrated by its history of race-based discrimination and brutality as reflected in both a statistical analysis of its policing and by the many cases brought by the victims of such brutality, and its additional misconduct and cover-up after killing Jay Anderson, Jr.

139. In addition, many other instances of Defendant Wauwatosa's similar constitutional violations show that use of excessive force by WPD officers, especially against Black

people and other people of color, is customary and the standard operating procedure in the City of Wauwatosa Police Department, as is racially biased policing. This pernicious, racist custom and practice persists today.

140. For example, throughout 2020-2021, the WPD developed, maintained, and shared a list of people they perceived as consistent protestors associated with the People's Revolution which is a mix of various community members protesting for police accountability in support of the three families of Alvin Cole, Jay Anderson, Jr., and Antonio Gonzales.

141. On February 2, 2020, Officer Mensah shot and killed Alvin Cole, Mensah's third killing of a person of color in less than five years. Cole who was on his knees when confronted by Mensah was of no risk to any other person when Mensah shot at him five times including in the back.

142. On September 2, 2019, WPD officers pulled over a car with two white women, Sandra Adams and Paulette Carter and one young Black teenager, Akil Carter, in it. Paulette Carter is Akil Carter's grandmother. When WPD officers approached the car, they ordered only Mr. Carter out of the car and drew their weapons. The officers, without any reasonable suspicion, ordered Mr. Carter to the ground, where he was handcuffed and arrested. When confronted later, the police claimed that they had been flagged down by two supposed witnesses who told them that two African American males had hijacked a blue Lexus. See Wisconsin Eastern District Court Case 19 CV 1422.

143. On August 10, 2006, WPD officers responded to a reported armed robbery by a Black man wearing a red shirt. That same evening, Aaron Lawrence, wearing different attire, was chased and tackled by WPD officer Lewandowski. After he was taken to the ground and handcuffed, officer Lewandowski searched for a weapon. Lewandowski never found one.

Nonetheless, Lewandowski used his taser several times on Mr. Lawrence, even though Mr. Lawrence had committed no crime and had made no threats against any individual. At one point, Lewandowski was applying significant pressure to Mr. Lawrence's back, causing him to have difficulty breathing. His inability to speak as a result led Lewandowski to tase him again several times for not responding.

144. On August 8, 2002 WPD officers responded to a report of a robbery by a Black woman. Ms. Alfrieda Durrah had the misfortune of being the first Black female the WPD encountered. Even though she did not fit the description of the suspect other than being a Black woman, and was just leaving her office job in work attire, she was surrounded by WPD officers with their guns drawn and pointed at her. They ordered her to the ground where they kneeled on her back and handcuffed her. At no point did they have any reasonable suspicion that Ms. Durrah had committed a crime. Although the police were able to corroborate that Ms. Durrah was not their suspect, they nonetheless took her back to the police station and placed her in a cell.

145. On June 25, 1996, Adrian Patterson was subjected to excessive force by WPD officers. In his complaint, he stated that Timothy Brenzel hurled racial slurs at him while in custody. Timothy Brenzel was a detective for the WPD.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourth Amendment Excessive Force**
**(Estate of Jay Anderson, Jr. Against Joseph Mensah,**
**Barry Weber and City of Wauwatosa )**

146. Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth herein.

147. At all times relevant to the allegations in this Complaint, the above-named Defendants were "persons" for purposes of 42 U.S.C. § 1983, were acting under color of state law, and were

acting within the scope of their official duties and employment in their capacities as officers of the WPD.

148. Defendant Mensah's use of deadly force as described herein was objectively unreasonable and excessive in light of the facts and circumstances confronting him at the time.

149. Under the Fourth Amendment, as incorporated against the states by the Fourteenth Amendment, Decedent Jay Anderson, Jr. had a clearly established constitutional right to be secure in his person against unreasonable seizures through the use of excessive force.

150. Under the application of the specific facts and totality of circumstances as described herein, Mensah violated Mr. Anderson's clearly established constitutional rights.

151. Any reasonable law enforcement officer knew or should have known of these clearly established rights at the time of Mr. Anderson's death.

152. Defendant Mensah did not have a valid legal basis to seize Mr. Anderson. There was no reasonable suspicion or probable cause to believe that Mr. Anderson had committed any crime.

153. Defendant Mensah did not have a valid legal basis to seize Mr. Anderson by killing him.

154. Defendant Mensah seized Mr. Anderson by means of objectively unreasonable and excessive force when he had no reasonable belief that Mr. Anderson had committed or was going to commit a crime or posed a threat to any officer or other person.

155. Defendant Mensah engaged in the use of deadly force that was objectively unreasonable in light of the facts and circumstances, violating Mr. Anderson's Fourth Amendment rights.

156. By shooting at Mr. Anderson with the express intent to kill him, Mensah's actions were objectively unreasonable.

157. By aiming for Mr. Anderson's head, Mensah's actions were objectively unreasonable.

158. Defendant Mensah's actions, as described here, were objectively unreasonable in light of the facts and circumstances confronting him.

159. Any reasonable officer in his position should have known that it was unreasonable to use the amount and type of force used and that to do so would violate Mr. Anderson's clearly established constitutional rights.

160. Any reasonable officer in his position should have known that it was unreasonable to intentionally fire at another person's head and to use force with the express intention to kill the other person and that to do so would violate Mr. Anderson's clearly established constitutional rights.

161. Defendant Mensah's excessive force caused Mr. Anderson to be unlawfully seized and thereby caused his death.

162. Defendant Mensah's actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Mr. Anderson's federally protected rights and he engaged in these actions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Anderson's constitutionally protected rights.

163. The acts of Mensah were pursuant to the customs, practices, policies, and/or training of Defendant City of Wauwatosa and Defendant Weber.

164. As alleged in detail above, Defendant Wauwatosa and Defendant Weber have a custom, policy, and practice of encouraging, condoning, tolerating, ratifying, and even rewarding the use of excessive force by Defendant Mensah. This is manifested through, among other things, WPD's grossly inadequate training, supervision, and discipline of Defendant Mensah relating to the use of excessive force.

165. Defendants Weber and Wauwatosa were on notice of WPD's defective customs, policies, and/or practices before Mensah's excessive use of force against Mr. Anderson.

166. The need for adequate mental health evaluations, effective policies related to officer involved shootings, adequate hiring procedures, additional and effective use of force policies, training, and/or supervision was obvious and Defendants Wauwatosa and Weber exhibited deliberate indifference to the known and substantial risk of harm to Mr. Anderson and others by failing to create adequate mental health evaluation policies, effective policies related to officer-involved shootings, adequate hiring procedures, and adequate use of force policies and/or to adequately train or supervise WPD officers in the use of force.

167. Defendants Weber and Wauwatosa's failure to create and implement adequate use of force policies and/or to adequately train and/or supervise WPD officers in the use of force was substantially certain to cause WPD officers to violate the constitutional rights of individuals like Mr. Anderson to be free from excessive force and these Defendants consciously or deliberately chose to disregard this risk in failing to change the use of force policies and/or adequately train and/or supervise WPD officers in the use of force. These acts and/or omissions constituted a deliberate choice by Weber and Wauwatosa among several alternatives to pursue a course of action regarding creating and implementing policies, training, and supervision in the area of use of force.

168. Defendants Weber and Wauwatosa set in motion a series of events they knew would cause Mr. Anderson, or an individual in a similar situation as Mr. Anderson, to be deprived of his constitutional right to be free from excessive force.

169. But for the above acts or omissions of Weber and Wauwatosa, Mensah would not have violated Mr. Anderson's constitutional rights, and such a deprivation was a natural and foreseeable consequence of Defendants Weber and Wauwatosa's acts and omissions.

170. The herein described acts or omissions of Defendant Wauwatosa, Former Chief Weber, and Former WPD Officer Mensah were the moving force behind the violation of Mr. Anderson's constitutional right to be free from excessive force and proximate cause of Plaintiff Estate's significant injuries, damages, and losses, including Mr. Anderson's death.

171. The herein described acts or omissions of the Defendant Wauwatosa, Former Chief Weber, and Former WPD Officer Mensah were the moving force and the legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but not limited to Mr. Anderson's death, the physical and mental pain and anguish Mr. Anderson suffered before and during his death, the loss of Mr. Anderson's relationship and companionship with his family and friends, the loss of Mr. Anderson's constitutional rights, his loss of enjoyment of life, and other compensatory and special damages including but not limited to Mr. Anderson's permanent lost earnings and earnings capacity, medical bills, and funeral expenses.

172. The intentional actions or inactions of Defendant Wauwatosa, Weber, and Mensah, as described herein, intentionally deprived Mr. Anderson of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**Failure to Train and Supervise**
**(All Plaintiffs Against Defendant City of Wauwatosa and Defendant Weber)**

173. Plaintiff hereby incorporates the foregoing paragraphs as if fully set forth herein.

174. Defendant Mensah violated Mr. Andersons' constitutional right to be free from excessive force resulting in death, as set forth in the First Claim for Relief.

175. Defendant Weber was, at all times relevant, a policymaker or final delegated decision-maker for the Wauwatosa Police Department, and in that capacity established policies, procedures, customs, and/or practices for the same.

176. At all times relevant hereto, it was known to Defendants that it was highly probable that Wauwatosa law enforcement officers would encounter citizens suffering from mental illness or intoxication, and that citizens suffering from such disorders are at a highly elevated risk of death from ordinary law enforcement use of force methods to restrain non-compliant persons.

177. Defendants were required to implement policies and train their officers with respect to dealing with persons who are mentally ill, emotionally disturbed, or intoxicated, including but not limited to: requesting backup from people with experience; training not to unreasonably agitate or excite the person; to contain the person; to respect the person's comfort zone; to use nonthreatening communications, and; to employ the passage of time to their advantage.

178. Upon information and belief, at all times material hereto, Defendants did not have specific policies, procedures and training governing law enforcement response to citizens suffering from such mental conditions and did not train all of their law enforcement officers on what uses of force with respect to such citizens were reasonable and constitutional and were, therefore, deliberately indifferent to the constitutional rights of such medically and/or mentally impaired citizens.

179.  Defendants also knew that absent the adoption of specific policies, procedures and tactics governing law enforcement response to citizens suffering from mental illness, and absent training of law enforcement officers in such policies, procedures and tactics, it was highly predictable that such failures to train would lead to law enforcement officers' violation of the Fourth Amendment Rights of citizens, and could likely result in the otherwise avoidable death of such citizens.

180.  This deliberately indifferent training and supervision resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendants.

181.  In light of the duties and responsibilities of those police officers that participate in interactions, arrests, or other dealings with mentally ill or emotionally disturbed individuals, the need for specialized training and supervision is so obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional rights in these recurring situations, that the failure to provide such specialized training and supervision is deliberately indifferent to those rights.

182.  Defendants knew or should have known that the police employees would use unreasonable force when dealing with mentally ill, emotional disturbed individuals, or highly agitated individuals.

183.  Defendants were deliberately indifferent to the constitutional rights of mentally disturbed and intoxicated individuals in the public, knowing that dangerous and potentially fatal consequences could be suffered by such individuals (including Mr. Anderson) by failing to properly train and supervise his employees. Defendants could have and should have

pursued reasonable methods for the training and supervising of such employees, but failed to do so.

184. The reckless and deliberately indifferent acts and omissions of Defendants in the training and supervision of its officers, as described herein, were moving forces in the predictable deprivation of Plaintiff's constitutional

185. Defendants also ratified the conduct of Defendant Mensah in concluding that that their conduct was consistent with the policies, procedures, and training of the Wauwatosa Police Department.

186. As a proximate result of Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses, including the death of Jay Anderson, Jr. entitling it to recover his compensatory and special damages, including loss of constitutional rights, pain and suffering during this event, lost earnings, permanent lost earnings and earnings capacity for the expected productive working lifetime of Jay Anderson, Jr. under the mortality tables, all in amounts to be proven at trial.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**Denial of Equal Protection**
**(Estate of Jay Anderson, Jr. against All Defendants)**

187. Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth herein.

188. At all times relevant to the allegations in this Complaint, the above-named Defendants were "persons" for purposes of 42 U.S.C. § 1983, were acting under color of state law, and were acting within the scope of their official duties and employment in their capacities as officers of the WPD.

189. At the time of the events at issue, Mr. Anderson had the clearly established constitutional right to be free from racial discrimination in law enforcement by police officers and to enjoy the equal protection of the laws.

190. Mr. Anderson's race was a motivating factor in Mensah's decision to seize him and to use excessive force against him. Mensah acted with the intent or purpose of depriving Mr. Anderson of the equal protection and benefits of the law, and equal privileges and immunities under the law, in violation of the Fourteenth Amendment.

191. Defendant Mensah treated Mr. Anderson less favorably—and with unreasonable force—than his similarly situated White counterparts, wholly or in part because he was Black.

192. There was no rational basis for Mensah's discriminatory actions and inactions, let alone a purpose narrowly tailored to serve a compelling governmental interest.

193. Defendant Mensah seized and used excessive force against Mr. Anderson without reasonable suspicion or probable cause to believe that Mr. Anderson had committed a crime, posed a threat of harm to any other person, or was a flight risk that would legally justify the force used. The lack of any such reasonable suspicion or probable cause, along with WPD's long history of racially biased policing, are evidence that the seizure of Mr. Anderson by Mensah's use of force against him was motivated in whole or in part because of Mr. Anderson's race.

194. WPD officers' history and disproportionate use of excessive force against Black people provide evidence of discriminatory intent. WPD's clear pattern of disproportionate use of excessive force against Black people is unexplainable on grounds other than race.

195. WPD Defendants intentionally, willfully, unreasonably, and wantonly seized Mr. Anderson by using excessive force against him, and/or failing to intervene in the use of excessive force against him, wholly or in part because of his race.

196. Defendant Mensah' actions were objectively unreasonable considering the facts and circumstances confronting them.

197. Defendant Mensah engaged in these actions or inactions intentionally, willfully, maliciously, and wantonly, showing deliberate indifference to and reckless disregard of Mr. Anderson's federally protected constitutional rights.

198. Defendants Wauwatosa and Weber failed to properly train, supervise, and/or discipline its employees regarding the constitutional requirement not to engage in racially biased policing, resulting in the Mensah's unlawful seizure via the use of excessive force against Mr. Anderson. Defendants Wauwatosa and Weber particularly failed to properly train, supervise, and/or discipline its employees regarding the use of excessive force against Black people, and the prohibition on using race as a motivating factor in taking police actions, including the use of force.

199. Wauwatosa's inadequate training, supervision, and/or discipline resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant Wauwatosa.

200. Considering the duties and responsibilities of personnel of Defendant Wauwatosa — who must police and interact with Black people regularly—and the frequency with which such law enforcement personnel will confront Black people while discharging their duties as law enforcement officers as described herein, the need for specialized training, supervision, and discipline regarding such decisions was so obvious, and the inadequacy of training

and/or supervision was so likely to result in a violation of constitutional rights, such as those described herein, that Defendant Wauwatosa is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

201.    Such failure to properly train, supervise, and/or discipline was a moving force behind and proximate cause of Mensah's racially biased treatment of Mr. Anderson, and makes up an unconstitutional policy, procedure, custom, and/or practice.

202.    Wauwatosa exonerated Mensah for his racially biased conduct under Wauwatosa's municipal customs, policies and/or actual practices described herein. Such decision to exonerate racially discriminatory conduct was made deliberately and pursuant to Wauwatosa's longstanding customs and practices. The decision sends a clear message that Mensah acted pursuant to the customs, practices, and policies of Defendant Wauwatosa.

203.    Defendant Wauwatosa's failure to adequately train and/or supervise, as well as the failure to take appropriate disciplinary or remedial action on past instances of similar unconstitutional conduct, as described herein, was a legal and proximate cause of Mr. Anderson's death.

204.    As a direct and proximate result of Defendants' actions, Mr. Anderson lost his life and Plaintiff Estate has been and continues to be damaged by Mensah's racially motivated seizure via unreasonable use of excessive force. Mr. Anderson endured physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, loss of consortium with his family and friends, and sense of security and individual dignity, and tragically the loss of his life at the age of 25.

205.    The herein described acts or omissions of Defendant Wauwatosa Weber, and Mensah, were the moving force and the legal, direct, and proximate cause of Plaintiff Estate's injuries

and losses, including but not limited to Mr. Anderson's death, the physical and mental pain and anguish Mr. Anderson suffered before and during his death the loss of Mr. Anderson's relationship and companionship with his family and friends, the loss of Mr. Anderson's constitutional rights, his loss of enjoyment of life, and other compensatory and special damages including but not limited to Mr. Anderson's permanent lost earnings and earnings capacity, medical bills, and funeral expenses.

206. Defendants' intentional actions or inactions as described herein intentionally deprived  Mr. Anderson of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

### FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment
### Loss of Society and Companionship
### (J.A. Against Defendants Mensah and City of Wauwatosa)

207. Plaintiff realleges and incorporates by reference the allegations of all the preceding paragraphs.

208. At all times relevant to the allegations in this Complaint, the above-named Defendants were "persons" for purposes of 42 U.S.C. § 1983, were acting under color of state law, and were acting within the scope of their official duties and employment in their capacities as officers of the WPD.

209. The killing of Jay Anderson, Jr. was a violation of his constitutional right under the Fourth and Fourteenth Amendments.

210. In killing Jay Anderson, Jr., the Defendants intentionally inferred in J.A.'s familial relationship with her father, Jay Anderson, Jr.

211. At the time of the killing, J.A. was sixteen months old and had a constitutional interest and right in the familial relationship with her father.

212. In killing Jay Anderson, Jr., Defendants have denied J.A. the opportunity to spend time with her father, have denied J.A. the support that her father would give, and have deprived her of a life-long relationship with her father.

213. As a direct and proximate result of Defendants' actions, J.A. has suffered significant and irreparable injury.

214. That the conduct of Defendant Mensah, as set forth in the preceding paragraphs which resulted in the death of Jay Anderson, Jr, deprived Starkeisha Delarosa of the society and companionship of her fiancé.

## FIFTH CLAIM FOR RELIEF
## MONELL CLAIM
### (All Plaintiffs Against City of Wauwatosa)

215. Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

216. The acts of Mensah, including shooting and killing Mr. Anderson without any justification or reasonable suspicion, was done in accordance with the Wauwatosa and its Police Department's de-facto policy, regulation, decision or custom condoning excessive force, failing to have an officer involved shooting protocols especially as it relates to psychological assessments, failure to adequately discipline and failure to properly train Mensah for such violations. That these respective de-facto policies were officially adopted, expressly or implicitly, or promulgated or practiced or ratified by Wauwatosa, through its police department, and as such constitute a de-facto governmental custom in such department, even though such custom may not have received written formal approval by

the City, and even though such de-facto policies are inconsistent with or even violate WPD's written policies.

217. This official or de facto policy or custom of utilizing excessive force, lethal force, and/or violating person's equal all in malicious or reckless disregard or with deliberate indifference to Mr. Andersons's Fourth and Fourteenth Amendment Rights by, among others, the Defendant Chief Weber's failure to adequately discipline Mensah for his unlawful conduct and for Defendant Weber's continued failure to adequately supervise Mensah.

218. That this official or de-facto policy and custom of utilizing excessive force, lethal force, and/or violating person's equal protection rights arose and/or was allowed to continue as a result of, among others, Wauwatosa and the WPD's failure to adequately supervise, discipline, and/or train its employees namely Defendant Mensah. Upon information and belief, the individual Defendant had used excessive lethal force particularly resulting in the death of an Antonio Gonzales who he shot at eight times killing him on July 16, 2015 after having been on the WPD's force for only seven months.

219. Upon information and belief, the individual Defendant Mensah had used excessive lethal force before killing Jay Anderson, Jr. , particularly resulting in the death of a Antonio Gonzales. who he shot at eight times killing him on July  16, 2015 after having been on the WPD's force for only seven months.

220. That the described conduct on the part of all the Defendant's was a cause of the plaintiff's injuries, losses and damages as set forth herein.

221. The misconduct described in this count was objectively unreasonable and was undertaken intentionally with malice and knowing disregard for Plaintiffs constitutional rights.

222. That the Defendant's conduct constituted a violation of the Fourteenth Amendment and/or Plaintiffs' equal protection rights guaranteed by that same Amendment.

223. While acting under color of law, Defendant deprived Plaintiffs of their Fourteenth Amendment rights for which Plaintiffs are entitled to damages proximately caused thereby.

224. Unless restrained by this Court, a real and immediate threat exists that the Fourteenth Amendment rights of the Plaintiffs' will be violated by WPD officers in the future and that Defendants will continue to engage in the unconstitutional and illegal conduct alleged herein, or other similar unconstitutional or illegal conduct, causing irreparable harm to Plaintiffs.

### SIXTH CLAIM FOR RELIEF – DELIBERATE INDIFFERNCE
### 42 U.S.C. 1983 - Deliberate Indifference
### (All Plaintiffs Against Defendants City of Wauwatosa and Barry Weber)

225. Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

226. Mensah shot and killed Antonio Gonzales on July 16, 2015 who was subjected to excessive force.

227. Defendant Weber and Wauwatosa knew of Mensah's violent and objectively unreasonable conduct of using excessive force and condoned, approved, and helped facilitate his violent behavior, which resulted in him also shooting and killing Jay Anderson, Jr.

228. Defendant Wauwatosa and Weber, by their actions and inactions, directly and indirectly approved and condoned Mensah's objectively unreasonable use of excessive force.

229. As chief of police, Defendant Weber had an obligation to address these constitutional violations in anticipation of future violence that Mensah would be impart and failed to address.

230.    Defendant Weber and Wauwatosa knew about Mensah prior objectively
        unreasonable violent conduct against Antonio Gonzales and acted with deliberate, reckless
        indifference to the constitutional rights of Jay Anderson, Jr., which resulted in Mensah
        shooting and killing Jay Anderson.

231.    Defendant's actions caused, directly and proximately, Plaintiffs to suffer damages.

### SEVENTH CLAIM FOR RELIEF
**Wisconsin Statute Section 895.46**
**Indemnification against Wauwatosa**
**(All Plaintiffs Against All Defendants)**

232.    Plaintiffs reallege and incorporate by reference the allegations of all the preceding
        paragraphs.

233.    At all times material hereto, Defendant Mensah was carrying out his duties as a WPD
        officer, and was acting within the scope of his employment with Wauwatosa.

234.    The conduct of Mensah, as set forth in the preceding paragraphs resulted in the death of
        Jay Anderson, Jr.

235.    Wauwatosa is liable, pursuant to Wisconsin Statute Section 895.46 for any judgment
        entered against Defendant Mensah in this action because at all times material hereto,
        Mensah was carrying out his duties as a WPD officer, and was acting within the scope of
        his employment with Wauwatosa.

236.    Defendant's Weber investigation and lack of any disciplinary actions were not complete
        and incompetent and/or constitute an attempted cover up Defendants Mensah's unlawful
        conduct.

237.    The acts of the Mensah, including shooting and killing Mr. Anderson without any
        justification or reasonable suspicion, was done in accordance with the Wauwatosa and its
        Police Department's de-facto policy, regulation, decision or custom condoning excessive

force in executing arrests, false arrests, and/or otherwise violating person's equal protection rights, including by the City's or in this case to date, Defendant Weber and Wauwatosa's, failure to adequately discipline Mensah for such violations. That these respective de-facto policies were officially adopted, expressly or implicitly, or promulgated or practiced or ratified by the Wauwatosa, through its Chief of Police Weber, and as such constitute a de-facto governmental custom in such department, even though such custom may not have received written formal approval by the City, and even though such de-facto policies are inconsistent with or even violate WPD's written policies.

238. This official or de facto policy or custom of utilizing excessive force, lethal force, and/or violating person's equal all in malicious or reckless disregard or with deliberate indifference to Mr. Anderson's Fourth and Fourteenth Amendment Rights by, among others, the Defendant Weber's failure to adequately discipline Mensah for his unlawful conduct and for Defendant's Weber continued failure to adequately supervise Mensah.

239. That this official or de-facto policy and custom of utilizing excessive force, lethal force, and/or violating person's equal protection rights arose and/or was allowed to continue as a result of, among others, Wauwatosa and the WPD's failure to adequately supervise, discipline, and/or train its employees namely Defendant Mensah. Upon information and belief, the individual Defendant Mensah had used excessive lethal force particularly resulting in the death of an Antonio Gonzales who he shot at eight times killing him on July 15, 2015 after having been on the WPD's force for only seven months and eleven months before Defendant Mensah killed Jay Anderson, Jr.

240. That the described conduct on the part of all the Defendants, including the former chief of Police for the WPD Defendant Weber, in his official capacity, was a cause of the plaintiff's injuries, losses and damages as set forth herein.

241. That such conduct was intended to cause Mr. Anderson and was unnecessary and severe physical, psychological, and emotional injuries that resulted in his death.

242. That such conduct on the part of all the individual Defendants was a cause of the Mr. Anderson's death and causing also severe psychological and emotional damages, suffered by the petitioners.

243. At all times material hereto, the individual Defendants acted maliciously and/or with reckless disregard and/or with deliberate indifference towards Mr. Anderson or in an intentional disregard of his rights, his life and as such all Defendant's should be liable for any and all punitive damages suffered by petitioners.

244. The Defendant Wauwatosa is liable pursuant to Wis. Stat. § 895.46 for payment of any judgment entered against this individual employee Defendant in this action because said Defendant was acting within the scope of his employment when he committed the acts described above.

**EIGHTH CLAIM FOR RELIEF**
**Direct Action Statute – Wis. Stat. § 632.24**
**(All Plaintiffs Against Defendant Insurance Companies)**

245. Plaintiffs incorporates by reference all of the allegations set forth in the preceding paragraphs as if fully stated and alleged herein.

246. At all material times and upon information and belief, all non-insurance defendants had in full force and effect one or more policies of insurance that provided coverage to each of them, insuring them against liability for their negligence and the negligence of their agents

and employees, and agreeing to pay any and all amounts that Defendants and their agents and employees may become legally obliged to pay for the aforementioned damages.

247.  Pursuant to Wis. Stat. §803.04, Defendants Cities and Villages Mutual Insurance Company and ABC, DEF, GHI and JKL are proper parties to this action.

248.  Pursuant to Wisconsin's Direct-Action Statute, Wis. Stat. §632.24, Plaintiffs are allowed to maintain this lawsuit directly against Defendants CVMIC, ABC, DEF, GHI and JKL.

**NINTH CLAIM FOR RELIEF**
**42 U.S.C. 1983 – Fourth Amendment**
**Loss of Society and Companionship**
**(Plaintiffs Estate of Jay Anderson, Jr. Against Defendants Mensah and Wauwatosa)**

249.  Plaintiffs reallege and incorporate by reference the allegations of all the preceding paragraphs.

250.  At all times relevant to the allegations in this Complaint, the above-named Defendants were "persons" for purposes of 42 U.S.C. § 1983, were acting under color of state law, and were acting within the scope of their official duties and employment in their capacities as officers of the WPD.

251.  The killing of Jay Anderson was a violation of his constitutional right under the Fourth and Fourteenth Amendments.

252.  At the time of the killing, J.A. had a constitutional interest and right in the familial relationship with her father.

253.  In killing Jay Anderson, Defendants have denied J.A. the opportunity to spend time with her father.

254.  As a direct and proximate result of Defendants' actions, J.A. have suffered significant and irreparable injury.

255.   That the conduct of Defendant Mensah, as set forth in the preceding paragraphs which resulted in the death of Jay Anderson, Jr, deprived Starkeisha Delarosa of the society and companionship of her fiancé.

**WHEREFORE**, the Plaintiffs demand judgment against the Defendants, jointly and severally, as follows:

1.      Against Defendant Joseph Mensah in his individual and official capacity, for compensatory damages, for the violation of Mr. Anderson's rights, as set forth above, in an amount to be determined at a trial of this matter;

2.      Against Defendant Chief Barry Weber, in his individual and official capacity, for compensatory damages for the violation of Mr. Anderson's rights, as set forth above, in an amount to be determined at a trial of this matter;

3.      Against Defendant Mensah for punitive damages for the violation of Mr. Anderson's rights, as set forth above, in an amount to be determined at a trial of this matter;

4.      Against Defendant Weber for punitive damages for the violation of Mr. Anderson's rights, as set forth above, in an amount to be determined at a trial of this matter;

5.      Against Defendant City of Wauwatosa for punitive and compensatory damages and for its liability pursuant to Wis. Stat. § 895.46 to indemnify the individual Defendants in an amount to be determined at a trial of this matter;

6.      For all costs, disbursements and actual without limitation, attorneys' fees  and expert fees pursuant to 42 U.S.C.A. § 1988(b) and (c);

7.      An award of prejudgment interest;

8.      Equitable and injunctive relief to prevent future violations of the law; and

9.     An order awarding such other and further relief as the Court deems just and equitable.

**PLAINTIFFS HEREBY DEMANDS A JURY TRIAL OF THIS MATTER
ON ALL ISSUES SO TRIABLE.**

Dated this 24th day of August, 2022.

**MOTLEY LEGAL SERVICES**

By: *s/Kimberley Cy. Motley*
    Kimberley Cy. Motley, SBN 1047193
    PO Box 1433
    Matthews, NC 28106
    (704) 763-5413 (phone)
    (704) 582-6229 (fax)
    Email: kmotley@motleylegal.com

**CADE LAW GROUP LLC**

By: *s/Nathaniel Cade, Jr.*
    Nathaniel Cade, Jr. SBN: 1028115
    Antonique C. Williams, SBN: 1051850
    Annalisa Pusick SBN: 1116379
    P.O. Box 170887
    Milwaukee, WI 53217
    (414) 255-3802 (phone)
    (414) 255-3804 (fax)
    nate@cade-law.com
    antonique@cade-law.com
    annalisa@cade-law.com

**ASCEND COUNSEL, LLC**

By: *s/E. Milo Schwab*
    Ascend Counsel, LLC
    2401 S Downing Street
    Denver, CO 80210
    Colorado State Bar No. : 47897
    (303) 888-4407 (phone)
    milo@ascendcounsel.co