**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

ESTATE OF JAY ANDERSON, Jr., by and through its
Special Administrator, Starkeisha Delarosa;
J.A., through her next friend Starkeisha Delarosa.

        Plaintiffs,                        Case No. 21-CV-1179

v.

JOSEPH MENSAH in his individual capacity,
BARRY WEBER, in his individual capacity,
CITY OF WAUWATOSA,
CITIES AND VILLAGES MUTUAL INSURANCE
COMPANY, and
ABC INSURANCE COMPANY,

        Defendants.

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

---

NOW COMES Plaintiff, Estate of Jay Anderson, Jr. et al, by their attorneys Cade Law Group, Motley Legal Services and Ascend Legal, to submit the following brief in opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint pursuant to Fed. R. Civ. Pro. 12(b)(6). Plaintiffs assert that Defendants' motion be denied for the reasons stated herein.

**<u>FACTUAL BACKGROUND</u>**

Plaintiff's civil lawsuit pursuant to 42 U.S.C. §1983, arises from the fatal shooting of Jay Anderson, Jr. at the hands of Joseph Mensah, a then Wauwatosa Police Officer, on June 23, 2016. Mensah discharged his weapon on Anderson in Madison Park in Wauwatosa, Wisconsin, killing him instantly without provocation.

Anderson was sleeping in his car before he was approached by Mensah at approximately 3:00 AM. Dkt. 47 (Plaintiff's Amended Complaint) at ¶ 86. Without suspicion or reason to believe a crime was or had been committed, Mensah woke Anderson by knocking on his car window. *Id.* at ¶¶ 96-101. Apparently groggy and intoxicated, Anderson was slow to wake up, which Mensah claims that he viewed as a lack of cooperation causing him to draw his weapon and point it at Anderson's head. *Id.* at ¶ 98. Mensah barked several orders to Anderson, including to raise his hands – Anderson willfully complied. *Id.* at ¶ 102. With Anderson's arms stretched to the air for nearly four minutes, it was apparent that Anderson posed no threat and never reached for a weapon. *Id.* at ¶¶ 102, 107-109. Due to sleepiness and intoxication, Anderson's arms fell from the air, and Mensah discharged his weapon three times into Anderson's skull. *Id.* at ¶¶ 106-114. The other three shots were lodged into Anderson's shoulder and throughout the car. Id. at ¶¶ 114-118. Anderson died instantly without ever committing a crime or presenting an ounce of hostile behavior.

The original complaint was filed on October 13, 2021, by Starkeisha Delarosa as Special Administrator of the Estate of Jay Anderson, Jr and on behalf of J.A. a minor child. Dkt. 1. Defendants filed a motion to substitute Defendant Weber for the current Chief of Police James MacGillis pursuant to Federal Rule 25(d). Dkt. 25. The Court submitted a Text Order Only on February 22, 2022, granting the motion to substitute. Dkt. 26. Plaintiffs filed their First Amended Complaint, reasserting claims against Barry Weber and other defendants, alleging the following causes of action: (1) Fourth Amendment – Excessive force; (2) Fourteenth Amendment – Failure to Train and Supervise; (3) Fourteenth Amendment – Denial of Equal Protection; (4) Fourth Amendment – Loss of

2

Society and Companionship; (5) *Monell* Liability; (6) Deliberate Indifference; (7) Wisconsin Statute Section 895.46 Indemnification Against Wauwatosa; (8) Direct Action Statute – Wis. Stat. §632.24; and (9) Fourth Amendment – Loss of Society and Companionship. Dkt. 47.

Defendants moved to dismiss claims against Barry Weber, the City of Wauwatosa, Cities and Villages Mutual Insurance Company, and ABC Insurance Company asserting that the Amended Complaint does not allege they violated Plaintiff's civil rights. Dkt. 51. Additionally, Defendants seek to dismiss the claims brought on behalf of J.A., the minor child of Anderson. Dkt. 51 at 6-7. Defendants characterize Plaintiff's Complaint as "wholly insufficient" and "confusing," yet the Complaint outlines the credible causes of action warranting relief.

## MOTION TO DISMISS STANDARD

Pursuant to Fed. R. Civ. P. 12(b)(6), a motion to dismiss challenges the sufficiency of the complaint on the basis that the plaintiff has failed to state a claim upon which relief can be granted. Dismissal is only appropriate at the pleading stage if it appears beyond doubt that the plaintiff can prove no set of facts that would entitle her to relief. *See Strasburger v. Board of Educ.*, 143 F.3d 351, 359 (7th Cir. 1998). Plaintiff has sufficiently pled facts that, together with reasonable inferences, demonstrate claims upon which relief may be granted when accepted as true to withstand the low bar of a Rule 12(b)(6) motion.

The Court must accept all of Plaintiff's well-pleaded factual allegations as true and draw all reasonable inferences in their favor. *Colfax Corp. v. Illinois State Toll Highway Auth.,* 79 F.3d 631, 632 (7th Cir. 1996). Fed. R. Civ. P. 8 only requires "a short and plain statement of the claim showing that the pleader is entitled to relief" and to "give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests." The federal rules "do not require a plaintiff to include much factual detail in a complaint." *Doe v. Purdue Univ.*, 928 F.3d 652, 665 (7th Cir. 2019); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (the plaintiff is not required to make "detailed factual allegations"). Unlike "fact" pleading, required in some states, "notice" pleading does not require the plaintiff to "plead law or match facts to every element of a legal theory." *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998). A complaint is not required to allege all, or any, of the facts logically entailed by the claim and a plaintiff is not required to plead evidence. *Id.* (citing *American Nurses' Assn. v. Illinois*, 783 F.2d 716, 727 (7th Cir. 1986). The plaintiff may plead conclusions, so long as "the conclusions . . . provide the defendant with minimal notice of the claim." *Jackson v. Marion County*, 66 F.3d 151, 153 (7th Cir. 1995). Plaintiffs' First Amended Complaint far exceeds these standards.

## ARGUMENT

## I. BARRY WEBER IS A PROPER DEFENDANT TO THIS LAWSUIT, BOTH INDIVIDUALLY AND OFFICIALLY.

As a preliminary matter, Plaintiffs concede that any action against Weber (individually or officially) with regard to excessive force related to Count 1 should be dismissed. However, the claims against Weber for deliberate indifference and failure to train and supervise are meritorious and must survive.

Defendants argue that Plaintiff's allegations against Weber are not clear on whether the action is against him in an individual or official capacity. Dkt. 51 at p. 3. Despite the Amended Complaint outright naming Weber in his individual capacity, Plaintiff's claims against Weber are rooted in both his individual and official capacities.

Yet, Defendants argue that regardless of whether Weber is sued individually or officially, relief cannot be granted. Defendants are incorrect for the following reasons.

>   ### A. The Allegations Against Weber Sufficiently Allege His Personal Involvement in the Death of Anderson Based on His Knowledge of Mensah's Behavior and Failure to Properly Train, Thus Establishing a Valid Individual Capacity Claim.

The Amended Complaint hosts numerous allegations against Weber based on his individual, personal involvement leading directly to the death of Anderson. There is no question on the face of Plaintiff's Complaint that Weber is being sued in his individual capacity because of his unconstitutional conduct.

"'[T]o establish personal liability in a § 1983 action, the plaintiff must show that the government officer caused the deprivation of a federal right.'" *Brokaw v. Mercer County,* 235 F.3d 1000, 1012 (7th Cir. 2000) (quoting *Luck v. Rovenstine,* 168 F.3d 323, 327 (7th Cir.1999)). "An official causes a constitutional violation if he sets in motion a series of events that defendant knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights." *Id.* Furthermore, "where the complaint alleges the tortious conduct of an individual acting under color of state law, an individual capacity suit plainly lies, even if the plaintiff failed to spell out the defendant's capacity in the complaint." *Hill v. Shelander,* 924 F.2d 1370, 1374 (7th Cir. 1991). Therefore, "[a]n official satisfies the personal responsibility required of § 1983 if [he] acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge or consent." *Smith v. Rowe,* 761 F.2d 360, 369 (7th Cir.1985) (internal quotations omitted).

Because Plaintiff's Complaint is rich with factual allegations that Weber caused or acquiesced the constitutional deprivations at stake, he has been put on notice to his

participation of Anderson's death and should be held liable. For instance, the Amended Complaint states that Weber made personalized decisions not to discipline Mensah for an earlier killing of Antonio Gonzales but instead celebrated Mensah's actions by awarding him the Medal of Valor in 2016 while Anderson's death was being investigated. Dkt. 47, ¶¶ 66-70. Anderson was Mensah's second killing, yet Mensah received an award a few weeks after killing Anderson for his "valorous and courageous" efforts in relation to the Antonio Gonzales shooting before the department had concluded whether Mensah's actions were proper. The decision to award Mensah such an honor was motivated by Weber's conscious or deliberate indifference to disregard department policies, former training, and the implementation of preventative measures to guarantee that a similar act would not occur. And, as we know, Mensah went on to kill a third individual.

Weber set in motion a series of events that he knew or reasonably should have known would cause others to deprive Anderson of his constitutional rights. Whether it be through blindly turning an eye toward conduct he knew should have been reprimanded, or decisively failing to properly train Mensah in the line of duty, Weber's personal inaction certainly led to Anderson's death. As the final delegated decision-maker for the Wauwatosa Police Department ("WPD"), Weber had an obligation to ensure that others were not recklessly or intentionally wreaking havoc in the community.

Defendants mistake the law by arguing that Weber must have had "direct personal involvement" at the scene of the crime for individual liability to attach. Dkt. 51, at p. 4. As noted, with regard to deliberate indifference and failure to train and supervise, Weber's involvement is not based on geographical location but rather his complacency in holding his department's officers accountable. Weber's knowledge of prior events (Mensah killing

Antonio Gonzales one year earlier), awarding Mensah the Medal of Valor during the investigation into Anderson's death, and the hard truth that Mensah went on to kill a third individual, puts Weber directly in line with personal liability. Weber's direct personal involvement is paramount to the allegations brought by Anderson. Therefore, this Court should deny Defendant's motion to dismiss and sustain the allegations against Weber in his individual capacity.

      **B.    Plaintiff's Complaint Sufficiently Alleges Weber's Involvement on an Official Basis and Lodges Allegations Consistent with His Official Capacity.**

Next, Defendants attempt to argue that because the City of Wauwatosa and Weber are named in the same causes of action – first, second, third, and sixth claims – that they are somehow duplicative. By claiming that the causes of action against both are "indistinguishable," Defendants fail to identify a single steadfast rule or case regulating which defendants a plaintiff may sue or how many times.

If we consider substance over form, it is also notably clear that Plaintiffs seek to sue Weber in his official capacity for his time spent with WPD. While the City of Wauwatosa is also a named Defendant, former Chief Weber's involvement in his official capacity demonstrates his assent to the failures occurring in his department. Furthermore, §1983 does not limit the number of defendants who may be liable for similar conduct despite Defendants' attempt to suggest it somehow does. In fact, an "official capacity suit will be presumed when indicia of official policy or custom are present in the complaint." *See Hill,* 924 F.2d at 1373.

In order for a plaintiff to succeed in an official capacity suit under § 1983, the plaintiff must allege that he or she suffered a deprivation of a constitutionally protected

interest, and that the deprivation was caused by an official policy, custom or usage of the municipality. *Monell v. Dept. of Social Services of New York City,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). A plaintiff's omission of the phrase "official capacity," does not necessarily render this solely an individual capacity suit. *See Hill* 924 F.2d at 1373; *see also Miller v. Smith,* 220 F.3d 491, 494 (7th Cir. 2000) (rejecting presumption that § 1983 plaintiffs who fail to designate whether defendant is sued in individual or official capacity intended an official capacity suit).

Importantly, Plaintiffs distinctly allege that an official policy or custom violated Anderson's constitutional rights via the failure to train and supervisor, a denial of equal protection, and deliberate indifference. When suing a defendant in his official capacity, the plaintiff must link the official's conduct to an express policy which caused the injury, a widespread practice that is so well-settled as to amount to a policy, or that the official had final policymaking authority for decision regarding the constitutional deprivations at stake. *Abbott v. Village of Winthrop Harbor,* 205 F.3d 976, 981 (7th Cir. 2000). Weber, as Chief during each of Mensah's killings, certainly had the final authority regarding an internal investigation, whether Mensah was fit for duty, and whether Mensah had the requisite training to continue working on the force. Weber's failure to follow guidelines after the death of Gonzales led directly to the death of Anderson, which in turn allowed the subsequent death of Alvin Cole.

Moreover, the amended complaint certainly mentions official customs and policies that have perpetrated a deadly result on a City level (i.e. racially-derogatory MLK parties going unchecked, failing to investigate and discipline Mensah after the death of Antonio Gonzales and Jay Anderson, and complacency in repetitive violent acts), but also links

8

those customs to Weber's failure to train and supervise his officers while unreasonably reacting to Mensah's uncontrolled behavior while on duty – thus generating his *official* liability. *See Miller,* 220 F.3d at 494. Even without explicitly naming Weber in his official capacity, a correct reading of the Amended Complaint discusses his promotion to Chief, his time spent in the department, and his decision-making powers related to City customs.

Furthermore, the commitment on a City level to ignore racism implicates *Monell* and deliberate indifference to known facts. This includes inadequate mental health evaluations of police officers and defective protocols related to officer-involved shootings. Paired with that truth is Weber's departmentally flawed vision which allowed for violence and objectively unreasonable conduct to stem from officers under his purview. *See* Dkt. 47 at ¶¶ 163-169, 171-172, 175-184, 194-195, 198-204 227-231. Deprivation of Anderson's constitutional rights can be alleged in any form, whether it be against the City or Weber but certainly cannot be dismissed because Plaintiffs name both Defendants simultaneously. Weber and the City should stand accountable for their actions (and inactions) consistent with the allegations put forward in Plaintiff's amended complaint. This is true not only in light of the small hurdle to defeat a motion to dismiss, but also because discovery is likely going to produce more evidence tying Weber and the City of Wauwatosa to unconstitutional conduct.

Plaintiff's Complaint sufficiently alleges causes of action that show that the City of Wauwatosa's custom or policy harmed Anderson. Likewise, Weber's then role as acting Chief calls into question his ability to operate the WPD with sound policies and protocol solely within his discretion, implicating Weber's official liability.

For these reasons, Defendants' motion to dismiss Counts 1, 2, 3, and 6 should be denied.

## II. J.A.'S CLAIM PROPERLY ESTABLISHES A LOSS OF COMPANIONSHIP CLAIM.

Defendants argue that the claims asserted against them on behalf of the minor child, J.A. should be dismissed because Plaintiff J.A. did not suffer a constitutional deprivation. Defendants, however, have neglected Plaintiff J.A.'s claim of Loss of Society/Companionship which is recognized in the Seventh Circuit as a cause of action by an individual whose relative is killed by a law enforcement officer. Defendants are correct that J.A. may not bring a suit to pursue injuries to her father, Jay Anderson. Here, J.A. has brought a claim for her *own* injury - the loss of companionship with her father.

The Seventh Circuit has long recognized a cause of action under 42 U.S.C. 1983 for Loss of Society and Companionship. *See Bell v. Milwaukee*, 746 F.2d 1205 (7th Cir. 1984). Courts in the Eastern District of Wisconsin, while acknowledging that there is no Seventh Circuit opinion directly on point as to whether a minor child may bring a Loss of Society claim on behalf of their parent, routinely have refused to dismiss such claims. *See Estate of Fiebrink v. Armor Corr. Health Servs.* 2019 WL 1980625, 18-cv-832-JPS (holding that "if a jury finds that [the Defendant] violated Fiebrink's civil rights, then this Court will permit the jury to hear Robert Martinez's claim (where Robert Martinez was Fiebrink's minor son)); *see also Avery v. City of Milwaukee*, 2015 U.S. Dist. LEXIS 65372 (holding that "[t]his Court discerns that the Seventh Circuit would find that the loss of companionship claims brought by Avery's children, all of whom were minors during the time of his incarceration, are cognizable under Section 1983").

In order to establish a claim for Loss of Society, a Plaintiff must establish that they suffered a loss of companionship when their relationship was terminated as a result of state action. *See Russ v. Watts*, 414 F.3d 783, 787 (7th Cir. 2005). Here, Defendant Mensah, a law enforcement officer, used excessive force in killing J.A.'s father, Jay Anderson on June 16, 2016. Dkt. 47, ¶ 112. J.A. was Jay Anderson's minor child. Dkt. 47, ¶ 10.

Accordingly, Plaintiff J.A. has sufficiently alleged a claim for Loss of Society. To the extent that Defendants rely on Plaintiff J.A.'s labeling of her Loss of Society Claim as falling within the 4th Amendment, Plaintiff will concede that this was a simple error and that such a claim is properly understood as a 14th Amendment claim. If the Court would prefer, Plaintiffs would request leave to amend the operative Complaint to correct this simple error.

### III.   PLAINTIFF'S FAILURE TO TRAIN AND SUPERVISE CLAIM ESTABLISHES A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Plaintiffs' second claim for relief states a claim under the Fourteenth Amendment for "failure to train and supervise" against the City of Wauwatosa and Weber. Dkt. 47, ¶¶ 22-25. In *Graham v. Connor*, the Supreme Court held that "a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person" are analyzed under "the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard." 490 U.S. 386, 388, 395, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989)

As a municipality, Wauwatosa may be subjected to liability under §1983 because it was engaged in the pervasive custom and practice of using excessive force against

Black individuals. The Amended Complaint documents this at length. Such was the source of the discrimination that led to the death of Anderson. There are three ways in which a municipality's policy can violate an individual's civil rights: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law'; or (3) an allegation that the constitutional injury was caused by a person with 'final policymaking authority.'" *Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728, 734-35 (7th Cir. 1994)(citations omitted); *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).

The Supreme Court explained in *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), that failure-to-train (or inadequate-training) liability arises when a municipality adheres to a training program "that they know or should know has failed to prevent tortious conduct by employees," thereby demonstrating deliberate indifference to this known risk. *Id*. at 407, 117 S.Ct. 1382. What separates this liability from traditional *respondeat superior* liability is a known pattern of tortious conduct demonstrating the need for additional training, "rather than a one-time negligen[ce]." *Id*. at 407–08, 117 S.Ct. 1382. Mensah's repeated conduct, especially after the first killing of Gonzales but certainly after Anderson's death, should have triggered Wauwatosa to take a harder look at its police department's policies in an effort to ensure similar conduct did not occur in the future. However, after the second (Jay Anderson, Jr.) and third (Alvin Cole) killings, Wauwatosa's inaction is anything but "one-time negligence."

In *Connick v. Thompson*, the Supreme Court recognized that a municipality's "decision not to train certain employees," despite actual or constructive notice that their actions constitute deliberate indifference to the rights of the public with whom they come into contact, is the "functional equivalent of a decision by the city itself to violate the Constitution." 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)(internal quotations omitted); *Flores v. City of South Bend*, 997 F.3d 725, 731 (7th Cir. 2021).

Plaintiff's Complaint details facts about the racially insensitive culture of the WPD, the actions of a whistleblower, disregard of racial animus by Weber despite the reports of "blackface parties", and promotion of known racists while investigations were underway. Dkt. 47, ¶¶ 139-145. In addition to those things, Plaintiff argues that Mensah's prior actions of using excessive force put the City on notice for actions that are likely to deprive individuals of their liberties. Yet, Wauwatosa failed to make sure that Mensah was fit for duty, that he knew how to properly deescalate events to lessen chances of harm or death, and that policies prohibiting disparate treatment of Black individuals were enacted and enforced. These facts certainly establish a failure to train and supervise officers against a racist culture, but also permeated a deliberate disregard of human life. Mensah's killings of three Black individuals are laced with racism and a lack of training and supervision regarding civilian encounters. There is no denying that Mensah's actions were induced by the City's failure to adhere to strict policies and trainings which implicates liability.

For these reasons, Plaintiff's failure to train and supervise claim should succeed as it states a claim upon which relief could be granted.

**IV.  THE COURT SHOULD NOT DISMISS PLAINTIFF'S THIRD CLAIM FOR RELIEF AS THE COMPLAINT PROPERLY STATES A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

Defendants next argue that claims regarding equal protection be dismissed based on an erroneous belief that Anderson was not treated unfairly and that Plaintiffs Complaint does not suggest otherwise. The Equal Protection Clause provides that "no State shall . . . deny to any persons within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. It is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). An Equal Protection Clause violation typically occurs when state action discriminates based on a person's membership in a protected class, such as race, or interferes with a person's fundamental rights, such as freedom of speech or religion. *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009). The Equal Protection Clause may also be violated if state action "irrationally targets an individual for discriminatory treatment as a so-called 'class of one.'" *Reget v. City of La Crosse,* 595 F.3d 691, 695 (7th Cir. 2010). The Estate of Jay Anderson asserts that Anderson, Jr., who was Black, is part of a protected class who was denied equal protection of the law by Defendants as properly alleged in the amended complaint. Dkt. 47, ¶¶ 89, 127.

"To maintain an equal protection claim, 'plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose.'" *Levan Galleries LLC v. City of Chicago*, 790 F. App'x 834, 835 (7th Cir. 2020) (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001)). *See Srail*, 588 F.3d at 943 ("Suspect classes include race, alienage, and national origin.")

Plaintiffs plead that WPD has a history of over policing Black people within the City of Wauwatosa. As alleged in the complaint, "In 2018, the City of Wauwatosa's population was reported as being only 5.3% Black, yet in 2018, 83% of arrests were of Black people

and 64% of traffic stops were of Black people." Dkt. 47, ¶ 40. As also alleged in the complaint, the City officers approach Black and Brown people as inherently suspicious and the WPD are more likely to use force against Black and Brown people. Dkt. 47, ¶¶ 46-47. As it relates to Mensah, Plaintiffs allege that Defendant Mensah "having learned the lessons of a police department rife with racism and racial discrimination, immediately decided that a Black man sleeping in his car was suspicious and dangerous." Dkt. 47, ¶ 89. As a result of this, Mensah decided to forego his training and used excessive force against Anderson whom he viewed as a suspicious Black man and as a result shot and killed him. Dkt. 47, ¶ 127.

Plaintiffs First Amended Complaint is well pled and has stated a claim upon which relief can be granted and should not be dismissed.

## V.      PLAINTIFF'S FIFTH CLAIM FOR RELIEF UNDER *MONELL* IS SUFFICIENTLY PLED BECAUSE PLAINTIFFS POINT TO THE CITY'S ACQUIESENCE OF REPEATED MISCONDUCT AND WIDESPREAD RACISM.

Defendants' entire argument in seeking to dismiss Plaintiff's claims for municipal liability is that Plaintiff has provided "no factual allegations to support" their claims and only "threadbare recitals." This is plainly untrue. Plaintiff has provided at least six separate instances of excessive force by Wauwatosa Police officers, including two by Defendant Mensah, a list of specific training that Wauwatosa did not provide to its officers, and a four-decade long culture of racial profiling and racist policing engaged in by the WPD which has resulted in discriminatory outcomes and conduct resulting in Jay Anderson's death.

To state a claim for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), a plaintiff must allege that a constitutional violation in one of three ways:

(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice, that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a "custom or usage" with force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority. *Brokaw v. Mercer County*, 235 F.3d 1000, 1013 (7th Cir. 2000). Additionally, a plaintiff must show that the municipal action amounts to deliberate indifference and that the municipal action was the moving force in the constitutional violation. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) While normally an allegation of a custom will require evidence of multiple injuries, "[t]here is no magic number of injuries that must occur before [a defendant's] failure to act can be considered deliberately indifferent." *See Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009); *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 382 (7th Cir. 2017). Even "a single violation of federal rights can trigger municipal liability if the violation was a 'highly predictable consequence' of the municipality's failure to act. *Woodward v. Corr. Med. Servs. of Ill.*, Inc., 368 F.3d 917, 929 (7th Cir. 2004) (*quoting Bd. of Cty. Comm'rs of Bryan Cty.*, 520 U.S. 397 at 409 (1997)).

Additionally, a municipality may be held liable for the deprivation of a plaintiff's constitutional rights when the "inadequacy of police training … amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). A municipality may be found liable for its failure to train its officers in two circumstances: 1) when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights" that the deficiency

exhibits deliberate indifference, and 2) when a repeated pattern of constitutional violations makes "the need for further training … plainly obvious to the city policymakers." *Id.* at 390.

Lastly, a municipality may be held liable for the actions of an employee when it ratifies their conduct. *Waters v. City of Chicago*, 580 F.3d 575, 584 (7th Cir. 2009). Under the ratification theory, if a policymaker approves of a subordinate's decision and the basis for it, the municipality may be liable for such conduct. *St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988).

Here, Plaintiff has asserted that the City of Wauwatosa violated Jay Anderson's constitutional rights to be free from excessive force and to equal protection of the law.

A.   **Plaintiffs Have Sufficiently Pled a Custom of the Use of Excessive Force and a Failure to Train or Supervise Leading to Excessive Force**

Although Plaintiff has asserted a municipal liability claim against Defendant City of Wauwatosa and Mensah in the First Claim for Relief and in the Fifth Claim for Relief for the use of Excessive Force under the Fourth Amendment, Defendants do not raise either of these claims nor argue for their dismissal. Plaintiff specifically pled that Defendant Wauwatosa has a "custom of utilizing excessive force, lethal force" in the Fifth Claim for Relief. Dkt. 47*, ¶¶ 216-219. Since Defendants have failed to make any argument for failure to state a claim of custom or practice of excessive force, they have waived such argument to the extent that they intended to seek dismissal of the First Claim for Relief against Wauwatosa and Mensah as well as the Fifth Claim for Relief against Wauwatosa.

Nonetheless, Plaintiff has sufficiently pled a custom or practice of the WPD in using excessive force, specifically on Black people. Plaintiff has pointed to six separate instances of the use of excessive force:

- In 2019, without probable cause or fear of their lives, WPD officers drew their weapons at Akil Carter, threw him to the ground, and handcuffed him. Mr. Carter was not a threat to the officers and such use of force was excessive. Mr. Carter has sued for excessive force. *Carter v. City of Wauwatosa,* 2022 WL 3228046.

- In 2006, WPD officer Lewandowski threw another wrongly accused Black man, Aaron Lawrence, to the ground and tased him repeatedly, even though he didn't resist and was not the person WPD was looking for nor did he match the description. Mr. Lawrence sued for excessive force. *Lawrence v. Lewandowski*, 2009 WL 2950611.

- In 2002, WPD officers pointed their guns at a Black woman for whom they had no basis to suspect a crime and no basis for believing to be a threat. In arresting her, they kneeled on her back. Ms. Durrah sued for excessive force. *Durrah v. City of Wauwatosa*, 2009 U.S. Dist. LEXIS 152529, *12.

- In 1996, WPD officers subjected Adrian Patterson to excessive force. Mr. Patterson sued for excessive force. plaintiff. *Patterson v. Wauwatosa Police Dep't*, 930 F. Supp. 1293, 1294 (E.D. Wis. 1996).

- In 2015, Joseph Mensah shot and killed Antonio Gonzales, utilizing excessive force. Dkt. 47*,* ¶ 218.

- In 2020, Joseph Mensah shot and killed Alvin Cole, utilizing excessive force. *Id*. ¶¶ 71, 141.

However, Plaintiffs have alleged that not only did Wauwatosa have a custom of using excessive force, but it also failed to supervise Mensah, leading to his excessive use of force. Prior to permitting Mensah to return to active duty after his first killing, Wauwatosa never conducted a fitness for duty evaluation - indeed it did not have a policy. Dkt. 47*,* ¶¶ 63-64. Defendant Wauwatosa never conducted an internal investigation of Mensah's actions in killing Antonio Gonzales. *Id*. ¶ 65. Instead, without reviewing whether his conduct violated WPD policy, WPD awarded Mensah the medal of valor. *Id*. ¶ 68.

While Defendants argue that the Amended Complaint "is devoid of specific facts demonstrating the existence of a de facto policy or custom," this is simply a misrepresentation of Plaintiff's Amended Complaint. Plaintiffs have alleged that the WPD has a custom of racially biased policing, aggression, and violence when policing Black people, using excessive force against Black people, and failing to train, discipline, or supervise officers engaged in wrongdoing. *Id*. ¶ 134. In support of this allegation, Plaintiff provided significant facts showing a four-decade history of racist policing and racist WPD police officers.

Plaintiff has alleged a forty-year custom and practice of racist policing by the WPD During a period in the late 1980s and early 1990s, members of the WPD organized racist parties called "MLK parties" where they dressed in black face, advertised with pictures of Black people arrested by the WPD, and included literature from the Ku Klux Klan. Dkt. 47, ¶¶ 22-25. These parties were known to the leadership of the WPD, including Barry Weber, the Chief of Police for all times relevant in this Complaint. *Id*. ¶ 26. Nonetheless, WPD took no action to correct this culture, to discipline those officers, nor to train WPD officers on non-racist policing. *Id*. at ¶¶ 27-28. Instead, Weber protected and promoted those officers. *Id*.

Because the WPD refused to take any action to address this culture of casual racism and indeed promoted those very same officers, WPD continued to engage in racist policing in violation of the equal protection rights of Black people in Wauwatosa. As Plaintiff has alleged, the WPD arrest Black people at a rate of 15 times more often than white people - accounting for 83% of arrests despite being only 5.3% of the population. *Id*. ¶ 40. Additionally, Plaintiff provided data that WPD officers engage in longer traffic

stops when the suspect is Black. *Id*. ¶ 42. Plaintiff further alleged that this custom of racist policing is so well known throughout the community that Black people in the Milwaukee metropolitan area avoid driving through Wauwatosa because "a police officer will find a reason to pull Black people over." *Id*. ¶ 44.

Plaintiffs also provided a list of constitutional violations by WPD officers on the basis of racial discrimination:

- In 2019, WPD officers pulled over a car with two white women and one young Black man. *Id*. 142. They ordered the Black man out of the with no basis other than the color of his skin. He was instead driving with his grandmother.

- In 2006, WPD officers subjected Aaron Lawrence to excessive force on the basis of racial profiling. Mr. Lawrence brought suit against two WPD officers for racial discrimination as a result of this arrest including that one officer had called him "a racial name." *See 2009 WL 2950611.*

- In 2002, WPD officers arrested Alfrieda Durrah and subjected her to force on the basis that she was a Black woman. *Id*. at 144. The WPD officers had no probable cause other than racial profiling.

- In 1996, Adrian Patterson was subjected to excessive force by WPD officers and was subjected to racial slurs by WPD detective Timothy Brenzel *Id*. 145.

This conduct does not represent a one-off occurrence, but instead a decades long culture of treating Black people as more criminal and inherently suspicious. *Id*. ¶ 46. As alleged, WPD leadership was aware of these issues and was indifferent to it. Taken together, Plaintiff has sufficiently pled a custom of racist policing and profiling which too often results in the treatment of Black men as more dangerous. Moreover, Plaintiff has alleged that it was exactly this custom of treating Black men as more suspicious and

dangerous that resulted in Anderson's death. Plaintiff has alleged that Defendant Mensah "decided that Black man sleeping in his car was suspicious and dangerous." *Id*. ¶ 89.

Accordingly, Defendants' Motion to Dismiss Plaintiff's municipal liability claims for denial of Equal Protection rights should be denied.

## VI.    THE COURT SHOULD NOT DISMISS PLAINTIFF'S SIXTH CLAIM FOR RELIEF AGAINST THE CITY OF WAUWATOSA AND BARRY WEBER AS THE COMPLAINT ADEQUATELY STATES A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

On July 16, 2015, while only being with the WPD for seven months, Joseph Mensah shot and killed Antonio Gonzales who Plaintiffs argue was subjected to excessive force. Dkt. 47, ¶¶ 13, 226. Eleven months later, Mensah shot and killed Anderson, whom Plaintiffs are also alleging excessive force. As alleged in the Complaint, "Defendant Weber and Wauwatosa knew of Mensah's violent and objectively unreasonable conduct of using excessive force and condoned, approved, and helped facilitate his violent behavior, which resulted in him also shooting and killing Jay Anderson, Jr." eleven months after killing Antonio Gonzales. Dkt. 47, ¶ 227. Despite, being the only Wauwatosa officer responsible for killing anyone in Wauwatosa since at least January 2011, Weber and Wauwatosa failed to adequately investigate, failed to properly train, and failed to discipline Mensah for his use of excessive force against Antonio Gonzales eleven months prior. That failure amounted to deliberate indifference which resulted in Anderson's death, violating Plaintiffs' constitutional rights. Dkt. 47, ¶¶ 74, 228.

A municipality may be liable under 42 U.S.C. § 1983 for its failure to investigate incidents of force, and by extension, its failure to discipline officers for use of excessive force, when such failure amounts to deliberate indifference to the constitutional rights of persons within its jurisdiction. A municipality's patently inadequate system of investigation

of excessive force complaints is sufficient to support municipal liability for police officers' violation of plaintiff's rights. Municipal liability exists when there is evidence of deliberate indifference manifest by systemic and grossly inadequate training, discipline, and supervision. *See J.K.J. v. Polk County*, 960 F.3d 367, 381 (7th Cir. 2020).

To determine if an official acted with deliberate indifference, we look into his or her subjective state of mind. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S. Ct. 1970, 1981, 128 L. Ed. 2d 811 (1994)). Plaintiffs have alleged Defendant Weber's, as the chief policy maker for the WPD and Wauwatosa's actions and inactions directly and indirectly condoned Mensah's objectively unreasonable use of force resulting in Antonio Gonzales death on July 16, 2015, and predictably eleven months later in the death of Anderson on June 23, 2016. Dismissal on this ground is not ripe, and pursuant to standards of 12(b)(6), Plaintiffs stand on their allegations.

For all of these reasons, Defendants' request to dismiss the deliberate indifferent claim against Weber and Wauwatosa must fail and should not be dismissed.

## VII. DEFENDANTS JUMP THE PROVERBIAL GUN IN SEEKING DISMISSAL OF THE WIS. STAT. § 895.46 CLAIM BECAUSE "SCOPE OF EMPLOYMENT" HAS NOT BEEN DETERMINED.

Defendants jump the proverbial gun in making the argument that Count 7 of the Amended Complaint, which raises a claim under Wis. Stat. § 895.46, is not a proper claim and should be dismissed. Defendants' argument, boiled to its essence, is that the provisions of Wis. Stat. § 895.46 are automatically triggered if a public officer or employee is found liable. Dkt. 51, at 14, citing *Williams v. Michalsen*, No. 19-CV-56-PP, 2020 WL

193136, at *9 (E.D. Wis. April 21, 2020). Frankly, Defendants (and Judge Pepper) are wrong.

The indemnification provisions of Wis. Stat. § 895.46 are only triggered if:

[(1) the individual] . . . is proceeded against in an official capacity, or [(2) the individual] is proceeded against as an individual because of acts committed while carrying out duties as an officer or employee **and** the jury or the court finds that the defendant was acting within the scope of his employment . . . .

Wis. Stat. § 895.46. *See also Martin v. Milwaukee*, 904 F.3d 544, 547-549 (7th Cir. 2018).

Here, not only must the individual (either Mensah or Weber) be acting under "color of law" but the court or a jury must also find that either Mensah or Weber, or both, acted within the scope of his employment in order for indemnification to apply. *Martin*, 904 F.3d at 557 ("We do not hold sexual assault could never be within the scope [of employment]. We simply conclude that on these facts, even when viewed most favorably to [the plaintiff] and the verdict, no reasonable jury could find these sexual assaults were within the scope.").

Plaintiffs' counsel has faced a similar issue just recently where a state employee, a prison guard, was accused of having a sexual relationship with an inmate. While the guard was sued as an individual for acts committed while working as a guard, the Court found that a jury never determined if she was acting within the scope of her employment because the State of Wisconsin failed to raise the issue prior to the trial taking place. *See Carter v. Watson*, E.D. Wisconsin Case No. 18-CV-0727-BHL, Dkt. 129, at 18-20.

In *Williams v. Michalsen*, cited by Defendants, the deputies involved there clearly were acting within the scope of their employment in demanding driver's licenses from a pair of black ministers. Waukesha County never once argued that the deputies went

"rogue" or took an action outside of the scope of their duties. But that is not the case here, as Defendants have not conceded as much with regards to Mensah.

Here, Defendants cannot have it both ways – they cannot claim that Wis. Stat. § 895.46 is of no moment and should be dismissed, when the very issue of whether Mensah was acting within the scope of his employment when he killed Jay Anderson or Weber in how he failed to enact policies or discipline Mensah has not been determined. That is, unless Defendants want to concede both requirements of Wis. Stat. § 895.46 are met (i.e., Mensah and Weber were both acting under color of law and within the scope of their authority at all times) so that Count 7 of the Amended Complaint is moot.

Defendants' motion to dismiss on this issue should be denied, unless they concede that Mensah was acting within the scope of his employment.

## VIII.  PLAINTIFFS HAVE NOT ASSERTED A SECTION 1983 CLAIM AGAINST DEFENDANT CITIES AND VILLAGES MUTUAL INSURANCE CORPORATION.

Defendants incorrectly argue that Plaintiffs asserted a claim against Defendant Cities and Villages Mutual Insurance Corporation for violations of Section 1983. Nothing could be further from the truth. It is almost a waste of time to have to respond. A simple review of Counts 1 through 6 and 9 of the Amended Complaint clearly show that for each count, Plaintiffs are suing Wauwatosa, Mensah or Weber, and **not** CVMIC. The header for each of the seven counts at issue, save Count 3, make it very clear who the allegations in that count are directed against. The only count for which CVMIC might have an issue is Count 3, in that it states it is ". . . against All Defendants" in the header. However, a simple review of the allegations contained in Paragraphs 187-206 clearly indicate that no allegations are being made against CVMIC in this Count.

However, just so there is no confusion, Plaintiffs are not suing CVMIC for a violation of Jay Anderson's civil rights under Section 1983. Thus, Defendants' arguments in Section 8 of their motion to dismiss is moot.

IX.     **THE COURT SHOULD NOT DISMISS PLAINTIFF'S COUNT NINE AGAINST DEFENDANTS MENSAH AND WAUWATOSA AS THE COMPLAINT PROPERLY STATES A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

The complaint alleges that pursuant to Wis. Stat. 895.04(4) it states in relevant part that "loss of society and companionship may only be awarded to the spouse, children or parents of the deceased…" J.A. is the biological daughter of the decedent, Jay Anderson, Jr. and has standing to bring forth a claim for loss of companionship pursuant to Wis. Stat. 895.04(4).

The unfortunate death of Anderson by Defendant Mensah has denied J.A. the opportunity to spend time with her father, has denied J.A. the support that her father would give, and has deprived her of a life-long relationship with her father. Dkt. 47, ¶ 212. Anderson Jr.'s fiancé, Starkeisha Delarosa, is mother to his daughter J.A. Ms. Delarosa, is the Special Administrator and next friend to J.A. in this matter. Dkt. 47, ¶ 9. Plaintiffs do have standing to recover damages as they represent the Estate which is essentially J.A. the biological daughter of the deceased, Jay Anderson, Jr.

Count 9 of Plaintiffs First Amended Complaint is well pled and has stated a claim upon which relief can be granted and should not be dismissed.

X.      **DEFENDANTS ARE CORRECT AS TO PUNITIVE DAMAGES AGAINST WAUWATOSA AND ANY OFFICIAL CAPACITY CLAIMS.**

Plaintiffs concede that Defendants are correct that Plaintiffs may not recover any punitive damages against the City or any individual sued in their official capacity. *Hill v.*

*Shelander,* 924 F.2d 1370, 1374 (7th Cir.1991) ("[P]unitive damages [may] be recovered against a government actor only in an individual capacity suit.")

## XI.    PLAINTIFF'S INJUNCTIVE RELIEF SHOULD LIKEWISE BE DISMISSED.

Plaintiffs concede that Defendants are correct that Plaintiffs lack standing to seek an injunction and therefore agree that a request for such relief be dismissed.

## <u>CONCLUSION</u>

For the reasons stated herein, Plaintiffs respectfully request this Court **DENY** Defendants' Motion to Dismiss.

Dated this 28th day of September, 2022.

**MOTLEY LEGAL SERVICES**

By: <u>*/s/ Kimberley Motely*</u>
Kimberley Motely, Wis. Bar No: 1047193
2206 Bonnie Butler Way
Charlotte, North Carolina 28270
(704) 763-5413 (phone)
kmotley@motleylegal.com

**CADE LAW GROUP LLC**

By: <u>*/s/ Annalisa Pusick*</u>
Nathaniel Cade, Jr. SBN: 1028115
Annalisa Pusick SBN: 1116379
Antonique Williams SBN: 1051850
P.O. Box 170887
Milwaukee, WI 53217
(414) 255-3802 (phone)
(414) 255-3804 (fax)
nate@cade-law.com
annalisa@cade-law.com
antonique@cade-law.com

**ASCEND COUNSEL, LLC**

/s/ E. Milo Schwab
E. Milo Schwab
Colorado Bar No: 47897
2401 S Downing Street
Denver, Colorado 80210
(303) 888-4407 (phone)
milo@ascendcounsel.com

Attorneys for Plaintiffs